## Sexton v. Commonwealth.

(Decided Feb. 14, 1936.)

R. S. ROSE and L. G. CAMPBELL for apellant.

B. M. VINCENT, Attorney General, and GUY H. HERDMAN, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—Reversing.

Appellant, his father, Leamon Sexton, and Dester and Flem, his brothers, were charged with having banded, confederated, and gone forth to, and in pursuance of such plans, alarm, intimidate, and molest T. L. Roundtree and Paul Lloyd. The offense charged is denounced by section 1241a-1, Ky. Stats. 1930 Ed.

The indictment as to Dester was dismissed on motion of the commonwealth's attorney, because, as the order recites, there was not sufficient proof to convict. Appellant and Flem were placed on trial, with the result that a verdict of guilty was returned, and each received a sentence of one year in the penitentiary. Burrel appeals, contending that since there was no evidence of a conspiracy or a confederating within the meaning of the statute, supra, he was entitled to a peremptory instruction, which on motion was denied.

On the night of March 4, 1934, at some time between 9 and 11:30 o'clock, an automobile parked on the street in Stearns was broken into and two suitcases and a box of wearing apparel, all valued at $300, were taken therefrom. These articles belonged to a Miss Foster. Upon learning of her loss she immediately notified the sheriff's office, and the sheriff calling to his assistance a deputy or two, and Paul Lloyd, a railroad policeman had no difficulty in following the tracks of two persons which lead from the automobile to the home of Eph Kidd a short distance from Stearns. They found there one of the satchels which was in the possession of Clyde Kidd, and obtained information from him that the other satchel had been taken by Flem Sexton to his father's home. One of Roundtree's deputies returned to Whitley with Clyde, and the others proceeded to the home of Leamon Sexton, where they arrived some time after midnight.

From the proof it seems that the family had retired. Leamon, his wife and daughter, slept in one of

the front rooms; Flem and his wife, Burrel, Dester, and a boy called Jimmie, slept in another room or rooms. According to Roundtree he knocked at the door and told who he was. Leamon Sexton opened the door; Roundtree and Lloyd went in, and the deputy went to the rear of the house. The sheriff told Leamon that he had information that Flem had brought a suitcase home and that he had come to talk to him about it; the old man then said that no search could be made without a warrant. The sheriff replied that he would send and get a warrant, and he and Lloyd went into the yard and dispatched the deputy for a warrant. The old man built a fire, and they, the father, the sheriff and Lloyd sat down around the fire. The sheriff says the boys began getting up and Flem called Lloyd in the room where he was, and in a few seconds the old man went in with them, but immediately came back, went to his bed, and got a pistol from under a pillow and placed it in his holster. The sheriff says that during all this time Burrell was in an "opposite room from where that was going on, over to the right."

The sheriff testifies that after the father had placed the pistol in the holster he walked over to him and "ran his hand across my face, and said: 'This is one G. D. trip, you will regret making young man.'" And he replied: "Leamon, just sit down and be quiet. Sam will be back in a little while with a search warrant; if I find anything it will be all right, and if I don't it will be all right." The sheriff says the old man then looked like he was going to step back, and reached like he was going to get his gun and said, "What damn business have you got in my house any way." Roundtree "beat him to the draw," and pulled his 44 special; the father grabbed for the sheriff's gun and they clenched and scuffiled, and just at this point Flem came into the room from one point and Dester from another. Flem took the sheriff's gun from him, and as the sheriff says, "Flem was trying to shoot me"; but he kept the father between him and Flem. They were still scuffling when the girl Dorothy picked up a poker and hit the sheriff.

At this point it appears from the sheriff's testimony, Burrel first appears with a rifle, "but did not do anything at the time." About this time the sheriff got out the door; Flem had taken the rifle from Bur-

rel, and coming into the yard hit the sheriff with it. The sheriff then got a 32 pistol from his pocket and shot Flem, who stumbled backwards, recovered himself, and ran around the house. The sheriff concealed himself behind a tree, and in a few minutes he heard a gun fire in the house, and Lloyd came out bringing the father with him; they were scuffling over the gun, and when this scuffle ended without serious results Roundtree and Lloyd left the scene.

Lloyd's testimony coincided with Roundtree's except that he thinks Flem hit the sheriff with the poker. He was not in the room during the colloquy between the sheriff and the father, but came in when the scuffle was going on between them. He states that "two of the boys were trying to get hold of Roundtree's pistol"; that he thought it was Dester and Flem, and "after Flem got it, either Burrel or Dester grabbed the pistol from Flem and said 'by God if you can't use it give it to me or somebody who can.'" He saw Burrel on the outside with a rifle.

It is not necessary to review at length the testimony adduced for appellant. In the main except as to certain details, it does not differ from that of the commonwealth. It is shown that Flem, Dester, and Burrel lived at the home of the old man, and on this particular night had retired and were only aroused when the sheriff came into the house. They fix the time at 4 a. m., or a little later. They do say that search was made when they first came in, the girl testifying that the old man told them, "if a suitcase is what you are looking for go ahead and search." Dorothy says that neither Dester nor Burrel came into the room until after the scuffle between the sheriff and Leamon had begun. She also says that after Roundtree went into the yard, Jimmie, the little boy, saw the dog grab Roundtree; he called for some one to go out and stop the dog, and Flem went out, and while he was trying to get the dog off Roundtree the latter shot him. Jimmy testified that this was true.

Accepting the testimony of the commonwealth as being true in every respect, we are not presented with such a state of facts as would justify us in holding the proof sufficient to be submitted to the jury. The theory of the commonwealth seems to be that when the

officers went to Eph Kidd's home and arrested Clyde and received information concerning Flem, that Clyde's brother left the house and went to Sexton's home and gave warning that the sheriff was on his way. All this is but an inference having as its basis the testimony of Clyde's mother that her other son left the room or house momentarily, and not of such strength, standing alone, to form a conclusion that he went to Sexton's home.

A confederacy or a conspiracy may be established by acts, conduct, or declarations of those who are participants, but not by suspicion or by the mere association of parties. Glass v. Com., 249 Ky. 757, 758, 61 S. W. (2d) 629. Here we have a case where the appellant with other members of his family were where they had a right to be. They were visited by the sheriff and his aides, admittedly on a legitimate mission, and while there, due to certain actions, either of the sheriff or Leamon Sexton, there arose a sudden affray, which culminated in the array of the family against the sheriff and his party.

There is a lack of evidence in the way of related facts or circumstances, all being taken together, as would warrant a conclusion of a conspiracy, confederating or banding together as and for the purposes denounced by the statute, supra. As we said substantially, in the Glass Case, supra, the inferences here are too meager to warrant the deduction of a legitimate conclusion. The statute supra was not intended to meet situations such as appear here, though it might be applied if the proof was such that its application and effect were justified. The court should have granted the motion for a peremptory instruction.

Judgment reversed, with directions to grant appellant a new trial and for further proceedings consistent with this opinion.