STATE, Respondent v. CARLSON et al., Appellants

(112 N.W.2d 891)

(File No. 9916. Opinion filed January 9, 1962)

J. W. Kaye, Miller, Kaye & Hanson, Mitchell, for Defendants and Appellants.

A. C. Miller, Atty. Gen., Robert D. Hofer, Asst. Atty. Gen., Pierre, A. H. Shuster, Davison County State's Atty., Mitchell, for Plaintiff and Respondent.

SMITH, J.   The defendants were convicted of conspiracy as defined by SDC 1960 Supp. 13.0306. The first three of the defendants, as they are named above, have appealed. By an adequate record and appropriate assignment they question the sufficiency of the evidence to support an inference that they conspired to commit an offense against the state of South Dakota as charged in the information.

In so far as it is pertinent SDC 1960 Supp. 13.0306 reads as follows:

> "If two or more persons conspire * * * to commit any offense against the state of South Dakota * * * and one or more of such parties do any act to effect the object of the conspiracy, each of the parties to such conspiracy shall be fined not more than ten thousand dollars, or imprisoned in the State Penitentiary for not more than five years, or both."

The count of the information upon which their conviction rests charges that they

> "did wilfully, wrongfully and feloniously conspire to commit an offense against the state of South Dakota, namely: grossly disturbing the public peace, in that they did conspire to threaten, to intimidate, to use abusive language against, and to cause fear to the persons of Robert Sinclair, Edward Beers, Joan McKittrick and Bonnie Connor, and that they did at Mitchell, South Dakota, on the 10th day of January, 1960, do acts to effect the object of such conspiracy; To-wit: did strike the person of Robert E. Sinclair".

To grossly disturb the public peace is made a misdemeanor by SDC 13.1401.

It is settled that an offense which is the object of a conspiracy, and the conspiracy to commit that offense are distinct and separate crimes. State v. Sinnott, 72 S.D. 100, 30 N.W.2d 455 and Pereira v. United States,

347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 435. A real agreement between two or more persons, either express or tacit, to commit the crime which is the alleged object of their conspiracy is of the essence of the crime of conspiracy. SDC 1960 Supp. 13.0306; 15 C.J.S. Conspiracy § 36, P. 1059; and 11 Am.Jur., Conspiracy, § 4, p. 544. Cf. 72 Harvard L.Rev. 925, and 23 Virginia L.Rev. 898. Such an agreement may be, and usually must be, proved by circumstantial evidence. 11 Am.Jur., Conspiracy, § 38, p. 570.

■ Of course, if the conviction rests on circumstantial evidence alone, such facts and circumstances must be shown as are consistent with each other and with the guilt of the party charged, and such as cannot by any reasonable theory to be true and the party charged be innocent. State v. Thomas, 78 S.D. 568, 105 N.W.2d 549.

Viewed in the light most favorable to the verdict the record reveals these facts.

During the late afternoon or early evening of January 10, 1960, Robert Sinclair and Edward Beers, then of Sioux Falls, left their wives at the Beers home and went to another residence in that city. There they met Joan McKittrick and Bonnie Connor of Mitchell. An arrangement was made for Sinclair and Beers to transport the young women to Mitchell. Before leaving the city they purchased a six pack of beer, some of which was consumed en route to Mitchell. When they arrived there they parked the Beers automobile about four parking meter spaces north of the entrance to Dick's Tavern on South Main Street. Upon entering the Tavern they took seats in a booth immediately back of a booth occupied by the four defendants and a girl friend of defendant Clark. As they were seated defendants Carlson and Grohs of the one group and Joan McKittrick and Robert Sinclair of the other had their backs to the shoulder-high partition separating the two booths. Both parties were drinking beer. Shortly differences of an unexplained character developed between defendant Carlson and Joan McKittrick, and he made a statement with reference to her morals. Soon there was talk between defend-

ant Carlson and Robert Sinclair and Carlson called Sinclair a foul name and inquired if he "wanted a piece of him". Sinclair replied that if Carlson would keep his companions off he would go outside with him. Other talk took place, but its nature and who talked is not clearly revealed. The only person who was identified as having made any particular statement was Carlson. At some time during the half hour the parties were in the Tavern, according to Sinclair, Grohs deliberately bumped him as they passed going to and from the rest room.

When the Sinclair party got up to leave the defendants followed. Carlson was the first out, but by the time the two men and women reached their car, the defendants were not far behind. Beers went around and took his place in the driver's seat and could tell nothing much about the subsequent events. Sinclair opened the rear door next to the curb and was about to enter. The two women were evidently not inexperienced in such situations. They armed themselves with beer bottles from the car, broke the bottles on the curb, and stood guard. McKittrick said, "I'd tear him all to pieces". As Carlson approached he removed his jacket, called Sinclair a foul name and said "come on". Then he reached around McKittrick and struck Sinclair in the face. Barnes at some time during these moments pushed McKittrick and she cut his hand with the bottle she held. Connor moved her hand toward Grohs, and made a threatening foul statement to him. He kicked the bottle from her hand. When she started to cry he examined the hand to see if she was injured. Clark stood by. In fact, the record fails to reveal that he was more than one of those present, both inside and outside the Tavern. Within minutes after Carlson struck Sinclair his party had loaded up and were gone. They immediately complained to the state's attorney and this prosecution resulted.

A finding of concerted action pursuant to an express or tacit agreement to do the acts charged in the information, in our opinion, rests on pure speculation. That participation in the offense charged as the object of the

alleged conspiracy may be considered with other circumstances in determining whether such an essential agreement had been reached, we do not doubt. However, this record reveals nothing but proof of some slight participation by others than Carlson in events which erupted from emotions of the moment. The defendants had seen McKittrick and Connor about Mitchell, but otherwise the two parties were strangers to each other and the conduct of the defendants toward the Sinclair party was without any common motivational background. That which happened stemmed from uncouth and vaguely explained exchanges between Carlson and Joan McKittrick. Proof of participation by anybody but Carlson, McKittrick and Sinclair in the happenings within the Tavern is shadowy. Eventually, as Connor said, "Carlson and Sinclair were going to fight." It is just as reasonable to believe that the prospect of such a combat brought the other defendants to the street as that they acted pursuant to a tacit agreement to grossly disturb the public peace. When they got there all but Carlson played very minor parts in the brief brawl which ensued.

The only cases which have come to our attention, which deal with a similar spontaneous circumstance, arose in the court of appeals of Kentucky. In Sexton v. Commonwealth, 262 Ky. 636, 90 S.W.2d 999, 1000, it was written:

"* * * Here we have a case where the appellant with other members of his family were where they had a right to be. They were visited by the sheriff and his aides, admittedly on a legitimate mission, and while there, due to certain actions, either of the sheriff or Leamon Sexton, there arose a sudden affray, which culminated in the array of the family against the sheriff and his party.

"There is a lack of evidence in the way of related facts or circumstances, all being taken together, as would warrant a conclusion of a conspiracy, confederating or banding together for the purposes denounced by the statute * * *".

Similar expressions occur in Glass v. Commonwealth, 249 Ky. 757, 61 S.W.2d 629 and in Fulks v. Commonwealth, 237 Ky. 642, 36 S.W.2d 36.

In contrast in Asher v. Commonwealth, 211 Ky. 524, 277 S.W. 842, the court wrote

> "It is true there is no direct evidence of any agreement by the defendants that they would act together and intimidate or harm the three Greeks, but the proof for the commonwealth that they went from one restaurant to another where the Greeks were employed, and did just that thing, and in each instance without provocation, indicate strongly that such action had been prearranged."

A word employed by the late Mr. Justice Jackson in his critical concurring opinion in Krulewitch v. United States, 336 U.S. 440, 445, 69 S.Ct. 716, 719, 93 L.Ed. 790, seems applicable here. By attempting to magnify a spontaneous barroom brawl to the proportions of a felonious conspiracy this prosecution "trivalizes" the conspiracy statute.

The judgment of the trial court is reversed.

All the Judges concur.