STATE, Respondent v. HOEYE, Appellant

(196 N.W.2d 365)

(File No. 10927. Opinion filed April 14, 1972)

**Willy, Pruitt & Matthews, Steve Jorgensen,** Sioux Falls, for appellant.

**Gordon Mydland,** Atty. Gen., **C. J. Kelly,** Asst. Atty. Gen., Pierre, for respondent.

WOLLMAN, Judge.

Defendant Rosalinda Hoeye appeals from the judgment imposing a two-year penitentiary sentence upon her following her conviction by a jury on a charge of assault and battery with a dangerous weapon with intent to do bodily harm without justifiable or excusable cause. SDCL 22-18-11.

Defendant's assignments of error raise two questions: (1) was the evidence, being largely circumstantial in nature, insufficient

to sustain the verdict and (2) did the trial court err in permitting a certain police officer to testify whose name was not endorsed on the information?

Sometime during the evening hours of June 14, 1970, defendant and her husband, James Hoeye, and defendant's sister, Mary Lou Pickering, age 14, were present in the Dew Drop Inn tavern in Sioux Falls, South Dakota. After a time James Hoeye left the tavern alone, leaving defendant and her sister with other companions. At about 10:30 that evening, defendant and her sister and three male companions left the tavern and went swimming at Lake Alvin. At about 1:10 a.m. June 15, 1970, the swimmers returned from Lake Alvin to the Dew Drop Inn and then went their separate ways. David Butler, one of the men who had accompanied defendant to Lake Alvin, heard a scream, which he described as "awful agonizing." His curiosity aroused, he went over to the Hoeye home, which was across the street from the tavern, where he saw defendant drag another woman by the hair out of the house and down the steps to the yard, where defendant proceeded to fight with her. Mr. Butler and others who had been attracted to the scene by the disturbance separated the two combatants and the other woman was persuaded to leave the scene with one of the swimmers.

After the fight with the other woman had been stopped by the bystanders, defendant picked up some of her clothing[1] and went back into the house where Mr. Butler heard her arguing with her husband about whether defendant was going to come back or go somewhere else for the remainder of the night. Mr. Butler got into his car and started driving away. As he stopped for the stoplight at the corner he heard defendant and her husband screaming. By looking back over his shoulder Mr. Butler was able to see through the open front door of the Hoeye residence. He testified that at that point in time defendant and her husband were pushing each other around. In Mr. Butler's words, " * * * it was the type of argument I thought somebody was going to get hurt a

---

1. Mr. Butler testified that before the group left to go swimming at Lake Alvin he had seen Mr. Hoeye throw some clothes out of the front door of the Hoeye residence. Screaming in a rage, Mr. Hoeye then went upstairs, where he opened the second story window and "threw everything out there."

little bit and I sat through two stoplights watching and I decided on my own somebody should stop this." Mr. Butler went around the corner and parked his car and then walked back and told Mr. and Mrs. Robert Troutman, the owners of the Dew Drop Inn who had just locked up the tavern and were preparing to leave, that if someone didn't stop what was happening across the street somebody was going to get hurt. As Mr. Butler stood talking to the Troutmans, Mary Lou Pickering came out of the Hoeye home and over to the Troutmans and Butler, screaming and crying hysterically. At this time defendant and Mr. Hoeye came out of the front door of the house screaming and fighting. Mr. Butler testified that the two fought on the porch for a second and then fell off the porch to the ground, whereupon Mr. Hoeye got to his feet and kicked defendant at least twice in the region of her head. Mr. Butler ran across the street to stop the fight, at which time he observed that James Hoeye had been stabbed and was bleeding. Mr. Butler stopped a passing police car and told the officer what had happened. He later looked inside the door of the Hoeye residence where he observed blood over the room and saw a knife lying right inside the door. He testified that after defendant and her husband came out of the house and fell on the ground no one else either entered or left the house until the police arrived.

The substance of the Troutmans' testimony was that they had observed defendant and her husband struggling and fighting in the doorway and on the porch of the house and that the Hoeyes had fallen off the porch together.

Mary Lou Pickering, who was called as a witness on behalf of the state, testified that Mr. Hoeye would not permit defendant to enter the house upon her return from Lake Alvin. After the other woman had been dispatched by defendant, Mary Lou and defendant went into the house. Mary Lou sat down on the couch while defendant carried some clothes in from outside. Miss Pickering noticed defendant and her husband scuffling near the door and saw defendant holding a knife in her hand.[2] She saw

---

2. It should be mentioned that because Miss Pickering was sick upon her return from Lake Alvin, apparently as a result of consuming two alcoholic drinks earlier in the evening, she was sitting on the couch with her head down and did not pay any attention to the early part of the struggle between defendant and her husband.

Mr. Hoeye twist defendant's arm as the two struggled out the front door to the porch. Defendant apparently dropped the knife as a result of having her arm twisted.[3]

Medical testimony showed that James Hoeye had suffered four wounds in the fight. The major wound was in the left thigh and was approximately an inch and a half in length and three or four inches deep and had severed the major artery and a vein. He also had a wound in the abdomen similar in appearance to the one on the leg, approximately three inches deep, and a wound in the left forearm an inch and a half in length and depth which had transected the muscles in the arm. There was also a superficial wound in the chest wall. The attending physician testified that Mr. Hoeye's condition at the time he was brought to the hospital was extremely serious because of loss of blood and that his condition remained quite serious for the next day or so.

After the testimony summarized above had been introduced, the state moved for permission to add the name of Max Madsen to the information. A hearing was held in chambers at which the state explained that Mr. Madsen, a detective with the Sioux Falls police department, had been chief investigator in the case and that it was simply an oversight that his name had not been endorsed on the information prior to arraignment and trial. After listening to arguments by defense counsel and the deputy state's attorney, the court granted the motion to add Mr. Madsen's name to the information on the condition that he not be permitted to tesify as to any admissions or confessions purportedly made by defendant.

Further proceedings were held in chambers during which defense counsel stated that he had observed one of the jurors talking to Mr. Madsen earlier in the day. The court then denied the state's motion to add Mr. Madsen's name to the information.

The state made an offer of proof to the effect that Mr. Madsen did not know the juror who had spoken to him and that he wonder-

---

3. The evidence showed that defendant suffered a fracture of her right elbow as a result of the fight with her husband.

ed who she was and why she had spoken to him. The court stated that there was not any good excuse for not endorsing on the information the name of the man who had investigated the whole case and again denied the state's motion to add Mr. Madsen's name.

Defendant's case consisted of her testimony and the testimony of her husband. The substance of Mr. Hoeye's testimony was that he has a very violent, quick temper, the result of which he had struck his wife on occasions prior to the night he was injured. He testified that he had built up an anger towards defendant during her absence on the night of June 14-15 and that he had a girl in the house when defendant returned from the lake. His version of the fight was that he told defendant that she was not going to come into the house, that he struck defendant several times, that he pulled defendant towards him, at which time he felt a pain in his leg, that he twisted defendant's arm and that as he lurched forward dodging back from the knife he saw the knife falling on the floor behind defendant. He claimed that he shoved defendant out the door, kicked her off the porch, jumped down on the ground beside her and started kicking her again. His recollection of what happened next was rather vague:

> " * * * and then I don't know, I was struggling with somebody, I don't know who, and I remember feeling something cool, cold on my chest and I went like this (indicating) and my hand was all bloody and I says, 'Oh, my God, Linda, help me,' and I started to fall and I remember that shadow coming up hitting me in the face as I was falling. I remember somebody standing between, to my left, toward the street light and the next thing I know I woke up in the intensive care."

Mr. Hoeye testified that the knife which defendant had in her hand was lying on a TV tray just inside the door at the time the struggle started. On cross-examination, he persisted in his testimony that he had kicked defendant off the porch and then jumped off the porch after her, this contrary to the testimony of the state's eyewitnesses.

Defendant testified that her husband has a quick and violent temper, that prior to June 14-15, 1970, he had struck her and that in January of 1970 she had suffered a miscarriage as a result of a beating at his hands. Her version of the fight was that her husband had grabbed her by the throat and told her she was leaving. She replied she was not leaving, whereupon he started to hit her. She became frightened and reached around and picked up the knife and told him not to hurt her. Mr. Hoeye then took hold of her and pulled her toward him. He twisted defendant's arm back, causing the knife to drop to the floor, and pushed her out of the house where he kicked her off the porch. He then jumped down from the porch and came over and started kicking her. Defendant testified that she was afraid that her husband was going to harm her and that she had grabbed the knife for the purpose of scaring him with it. She admitted on cross-examination that she had cut her husband once with the knife when he pulled her towards him, but she claimed that this was an accident. She denied inflicting the other three wounds upon him. She admitted that she had made some untruthful statements to Mr. Madsen concerning the facts of the fight and that she had earlier told her sister that she would explain that her husband's injuries were accidentally inflicted.

In rebuttal, the state called Detective Madsen who testified that defendant had told him that Mr. Hoeye was beating up on her sister, Mary Lou, and that when he refused to heed defendant's request to stop it defendant grabbed the knife. She had also told Detective Madsen that she had more or less pulled her husband off the porch at the same time she fell off and that she had the knife in her hand at the time she fell to the ground.

Defendant claims that the evidence was not sufficient to sustain the verdict and that the circumstantial evidence did not exclude to a moral certainty every other hypothesis except that of guilt. She claims that it is just as reasonable from the evidence in the case, taken in the light most favorable to the verdict, that the following hypotheses might be reached other than that of guilt: (1) that the injuries suffered by Mr. Hoeye were inflicted by defendant's sister, Mary Lou Pickering (2) that the injuries suffered

by Mr. Hoeye were inflicted by an unknown person (3) that defendant was assaulted by her husband and acted in self-defense (4) that the injuries suffered by Mr. Hoeye were accidentally inflicted.

This court has reviewed many cases involving convictions based on circumstantial evidence. Many of these cases are cited in State v. Flake, 83 S.D. 655, 165 N.W.2d 55, where we said:

"To secure a conviction on circumstantial evidence there must be more than a mere suspicion of guilt or a possibility of guilt. State v. Wolfe, 61 S.D. 195, 247 N.W. 407. The proven circumstances must not only be consistent with guilt, they must also be inconsistent with innocence. The circumstances as a whole should be of a conclusive nature pointing to a moral certainty that the accused committed the crime charged, and cannot by any reasonable theory be true and the accused be innocent."

In State v. Scott, 84 S.D. 511, 173 N.W.2d 287, 290, we held that:

"To warrant a conviction upon circumstantial evidence **alone,** such facts and circumstances must be shown as are consistent with each other and with the guilt of the party charged, and such as cannot by any reasonable theory be true and the party charged be innocent. State v. Thomas, 1960, 78 S.D. 568, 105 N.W.2d 549; State v. Carlson, 1962, 79 S.D. 411, 112 N.W.2d 891. However, the last phrase of this rule does not mean that the evidence must be such as to exclude every **possible** hypothesis of innocence; rather, it requires only the exclusion of **reasonable** hypothesis of innocence." (emphasis added)

In the instant case there was direct evidence that defendant was the only person in possession of the knife at the time of the fight; that James Hoeye suffered four wounds that could very well have been inflicted by the knife; that defendant was extremely angry

immediately prior to the struggle with her husband, as was manifested by the manner in which she ejected the other woman from the Hoeye home; and that at least one of the wounds was inflicted while defendant was in possession of the knife.

■■ The court's instructions, to which no exceptions were taken by either the state or the defendant, fully and fairly instructed the jury on all material elements of the case. The jury was instructed that " * * * if all the facts and circumstances shown can be reasonably accounted for upon any theory consistent with the innocence of the defendant, the jury should acquit the defendant". The jury obviously rejected the defendant's claim of self-defense as well as the other hypotheses that supported her claim of innocence. It was for the jury and not the court to pass upon the evidence. State v. Bates, 76 S.D. 23, 71 N.W.2d 641; State v. Scott, supra. The jury could reasonably conclude that defendant was guilty of the offense charged. We believe that the evidence amply supports the jury's verdict.

■■ We have considered defendant's claim that under all of the circumstances of the case Detective Madsen should not have been permitted to testify. We are not persuaded that the trial court committed error in permitting him to do so. It has long been the rule in this state that the names of rebuttal witnesses need not be endorsed on the information. State v. Butler, 71 S.D. 455, 25 N.W.2d 648; State v. Weinandt, 84 S.D. 322, 171 N.W.2d 73. The trial court properly permitted the state to call Detective Madsen in rebuttal.

The conviction is affirmed.

HANSON, P. J., and BIEGELMEIER and WINANS, JJ., concur.

DOYLE, J., not having been a member of the court at the time of argument, took no part in this decision.