UNITED STATES of America,
Plaintiff-Appellee,

v.

Rolland B. McMASTER, Defendant-
Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

William F. WOLFF, Sr., Defendant-
Appellant.

Nos. 15828, 15829.

United States Court of Appeals
Sixth Circuit.

March 25, 1965.

or "other thing of value" by an employer to, and acceptance of same by a representative of his employees, except in certain instances, including the sale of "goods or commodities for fair market value."

There were 32 counts in each indictment against each defendant alleging payment and acceptance of 32 separate sums, totaling $8,823.48, between September 12, 1956 and July 17, 1959. The Wolff indictment alleged that he caused the Youngstown Cartage Company, of which he was president, to make the payments to McMaster. The McMaster indictment alleged that he received the payments through Ram Transport, Inc. During the critical period McMaster was an official of Local 299—a Detroit local of the Teamsters Union—some of whose members were employed by Youngstown Cartage. Prosecution evidence tended to establish that at the same time McMaster was president and controlling stockholder of Ram Transport, Inc.

Both men were tried jointly before a jury in the United States District Court for the Eastern District of Michigan, Southern Division. No motion for severance was made; but at trial the two defendants took different positions. Wolff, through his counsel, relied primarily upon the exception contained in Sec. 186 alleging that the disputed payments were "fair market value" for the rental by Youngstown of a truck owned by Ram. McMaster relied primarily upon denial that he knew anything about such payments, since he claimed he had given Ram Transport, Inc., to his wife prior to the dates of the payments.

Emanuel Shapiro, St. Louis, Mo., Morris A. Shenker, Bernard J. Mellman, St. Louis, Mo., Lawrence A. Burns, Detroit, Mich., on brief, for McMaster.

George Gregory Mantho, Detroit, Mich., for Wolff.

William H. Merrill, Chief Asst. U. S. Atty., Detroit, Mich., Lawrence Gubow, U. S. Atty., Detroit, Mich., on brief, for appellee.

Before WEICK, Chief Judge, and MILLER and EDWARDS, Circuit Judges.

EDWARDS, Circuit Judge.

These appeals are from the convictions of a trucking company president (Wolff) and a Teamster Union official (McMaster) for violation of 29 U.S.C. § 186.[1] This statute prohibits payment of money

1. "§ 186. *Restrictions on payments to employee representatives; exceptions; penalties; jurisdiction; effective date; exception of certain trust funds*

"(a) It shall be unlawful for any employer to pay or deliver, or to agree to pay or deliver, any money or other thing of value to any representative of any of his employees who are employed in an industry affecting commerce.

"(b) It shall be unlawful for any representative of any employees who are employed in an industry affecting commerce to receive or accept, or to agree

to receive or accept. from the employer of such employees any money or other thing of value.

"(c) The provisions of this section shall not be applicable * * * (3) with respect to the sale or purchase of an article or commodity at the prevailing market price in the regular course of business * * *." 29 U.S.C. § 186. (The statute as noted above was applicable during the period covered by these indictments. It has since been amended. See Title 29 U.S.C.A. § 186, 1964 Cumulative Annual Pocket Part.)

Both of these arguments are reiterated before us on this appeal. A review of this lengthy record convinces us (as it did the jury) that evidence produced by the prosecution established that Ram Transport, Inc., was owned by McMaster during the period in question; that payment to it was payment to him for purposes of 29 U.S.C. § 186; and that this was not a bona fide exchange of goods or services "for fair market value."

Most of the facts essential to the view just stated are actually undisputed in this record.

The facts establishing the 32 payments totaling $8,823.48 by Youngstown to Ram Transport, Inc., on the dates in question are undisputed.

The facts establishing the deposit (and collection) of these 32 checks in the Detroit Bank & Trust Company account of Ram Transport, Inc., are undisputed.

The fact that defendant Wolff was president and controlling stockholder of Youngstown Cartage Company during the period of these payments is undisputed.

The fact that defendant McMaster was business agent of Local 299 is undisputed, as is the fact that some of Youngstown's employees were members of Local 299.

The fact that defendant Wolff caused these payments to be made by Youngstown to Ram is undisputed.

The fact that Wolff himself personally drew a majority of the checks in question is undisputed.

The fact that defendant Wolff and defendant McMaster knew each other, met socially, and were involved in other substantial business ventures together is undisputed.

The fact that prior to the period of these payments defendant McMaster was controlling stockholder of record of Ram is undisputed. (McMaster owned 132 shares; Edward J. Powers owned 5 shares.)

The fact that during the period of these payments the corporate records remained unchanged in this regard is undisputed.

The fact that defendant McMaster had access to substantial sums of money from Ram during the period of these payments is undisputed.

And, finally, the fact that during all of the period in question McMaster was frequently involved both in Detroit and in Chicago in representing Youngstown's employees as a Teamster business agent in direct negotiations with Wolff is also undisputed.

Two factual disputes are advanced— one by each defendant.

Wolff claims the payments were for rental of a truck owned by Ram for use by Youngstown's division in Detroit. The prosecution undertook the burden of proving the negative of this defense. In so doing they called all of Youngstown's terminal supervisors in Detroit, six office employees from the Youngstown office, and twenty of their Detroit truck drivers. The evidence is too lengthy and repetitive to summarize, but we have read it in full and conclude that the overwhelming weight of the evidence indicates that there was no such Ram-owned truck employed by Youngstown at the Detroit terminal during the period in question.

Against this evidence defendant Wolff's witnesses did not identify the make, the weight, the license, or a specific date of use or a specific load carried. The jury plainly concluded, as they had a clear right to do, that there was no such truck.

McMaster claims that, without any record being made thereof, he gave ownership of Ram Transport, Inc., to his wife prior to these payments; that he was estranged from her during the period of the payments, and that he had no knowledge of them. These assertions appear to us to be largely unsupported and obviously they proved unpersuasive to the jury. McMaster's credibility was

continually challenged on these and many other points during his testimony at trial. Plainly, the jury disbelieved him. A careful reading of McMaster's own testimony convinces us that the jury had a clear right to reach this conclusion.

McMaster relied primarily upon the facts that during the period in question his wife kept the books of Ram Transport, Inc., and signed all the checks on the Ram Transport account in the Detroit Bank & Trust Company, and that his was not an authorized signature as to the Ram Transport account during this period. He claimed that he and his wife had been separated in May of 1956 and that at that time he gave her Ram Transport, Inc., as to which he had acquired 100% of the stock in his own name on February 17, 1956.

No legal record of any such division of marital assets was ever made until a property settlement between McMaster and his wife Yvonne was signed December 19, 1960, prior to a decree of divorce between the parties, dated February 27, 1961.

■ During all the period in question it is undisputed that defendant McMaster and Yvonne McMaster maintained a joint savings account and a joint checking account at the Detroit Bank & Trust Company. McMaster admits that joint income tax returns were filed by him and his wife Yvonne for the years 1956 and 1957. The statutorily required Corporation and Securities Commission reports made to the state of Michigan by Ram Transport, Inc., which defendant McMaster claims were prepared and signed by his wife Yvonne without his knowledge, showed defendant Rolland McMaster as president and 100% stockholder of Ram Transport, Inc., during the years 1956, 1957 and 1958.[2]

Defendant McMaster contends that the division of property in 1956 between him and his wife Yvonne included her exclusive ownership of Ram and his exclusive ownership of another trucking company called M & G Trucking Company. But it appears that Yvonne McMaster was authorized to sign checks on the M & G Trucking Company account during all of this period and that he wasn't—exactly the same situation as prevailed in relation to Ram.

Yvonne McMaster did not testify in this trial. She had died May 26, 1961.

It may be pertinent to quote McMaster's own testimony as to his relationship with her during the period covered by this indictment.

"Q (By Mr. Noonan) Now, if the decree was dated February 27, 1961, how can you account for the fact that this division of property you just referred to took place in 1956, five years earlier? * * *

"A As I said about five minutes ago, I kept the M & G Trucking Company, she kept Ram Transport, and we had made an agreement. That is what it was. Nobody was— this wasn't one of those things where everybody is mad. We were still friends. After this was over, she also kept the books for my farm and she—we weren't mad at each other as far as not speaking to each other.

"Q Did you continue to be associated in business with her?

"A Well, in this respect, I helped her every way I could help her, and Mr. Powers also, and kept right on.

"Q Did she during this period or subsequent to the early part of 1956—May, I believe you said—did she keep the books for M & G Truck Company?

"A M & G, she kept the books for them also, yes. She kept them for the farm and M & G Trucking.

"Q Now, after this separation in 1956, Mr. McMaster, what further connection did you have with Ram Transport?

---

2. We believe the District Judge was correct in admitting these exhibits. 28 U.S.C. §§ 1732–1733. See also Rule 44, Fed.R.Civ.P.

"A Well, the only connection I had with Ram Transport after that was any way that I could help either he or she, I helped them. That is the only connection I had with the outfit."

This last observation by McMaster does not, however, appear to be entirely accurate.

The facts show substantial access to Ram funds on the part of Rolland McMaster personally during all of this period.

1) It is undisputed that on August 31, 1957, a credit of $1,500 to Rolland McMaster was entered on the Ram books to wipe out a loan previously owed by McMaster to Ram.

2) McMaster admits that a Ram check, dated July 18, 1958, for $3,000 was used by him for an investment in an Oakland County land deal. It is not claimed that this was ever repaid.

3) McMaster admits that a Ram check, dated February 15, 1960, for $3,000 was paid to the Idle Acres Farm account as to which he claimed sole ownership. This check was marked "Loan" on the Ram books, but apparently has not been repaid.

4) McMaster admits that a Ram check, dated May 12, 1959, for $12,503.50 was used by him for an investment in a Florida land deal.[3] It appears that this amount was repaid to Ram on August 14, 1959.

5) McMaster admits that a 32-foot Chris Craft boat was purchased for him out of Ram funds in May of 1956, the purchase price being $9,000. It appears that the down payment was made on this boat by a Ram check, dated May 23, 1956, in the amount of $1,000.

And McMaster admits that the other payments on the boat were likewise made by Ram, as well as payment of expenses for the operation of the boat. It also appears that when the boat was sold, al-

though McMaster is positive in asserting his personal ownership, the funds derived from the sale were redeposited in the Ram account.

6) It is also undisputed that Ram checks totaling $9,950 were deposited in the joint account maintained by McMaster and Yvonne McMaster during the period July 18, 1958 to May 23, 1960. McMaster's testimony in this regard is that though he had the right to write checks on this account, he never did, and that these funds were used by Yvonne for her separate business ventures and expenses.

McMaster, as indicated above, did indeed separate from Yvonne McMaster and a decree of divorce was ultimately entered between them in February of 1961.

Subsequent thereto McMaster was married again to an Elaine Mastaw. Cross-examination revealed that prior to his marriage to the present Mrs. McMaster, and during the period of 1956–1959, McMaster had also "helped" Elaine Mastaw establish a truck leasing company and that she and her brother had been involved in Youngstown Trucking Company's purchase of a site for a new terminal in Detroit. As McMaster put it: "I think she [Elaine Mastaw] and he [Miss Mastaw's brother] helped him [defendant Wolff] find a piece of land to put his trucks on and was involved in a house on the land."

The basic purpose of the statute under which these defendants were convicted is to prevent corruption in labor-management relationships affecting interstate commerce. The statute plainly does not require proof of the *quid pro quo*.

The Supreme Court has set forth this interpretation of the purposes of the statute:

"As the statute reads, it appears to be a criminal provision, *malum prohibitum*, which outlaws all pay-

---

3. On the occasion of this payment it is interesting to note that appellee's Exhibit 55 shows a Ram bank balance of $12,736.60 before deduction of the check for $12,503.50, and a balance of $233.10 thereafter.

ments, with stated exceptions, between employer and representative.

"The legislative history supports these conclusions. As passed by the House of Representatives, the Hartley Bill forbade employer contributions to union welfare funds, and made it an unfair labor practice to give favors to 'any person in a position of trust in a labor organization * * *.' H.R. 3020, 80th Cong., 1st Sess., § 8(a) (2). The scope of this bill was enlarged when it reached the Senate to include, in the words of Senator Taft, a 'case where the union representative is shaking down the employer * * *.' 93 Cong. Rec. 4746. The resulting Senate amendment made it criminal both for the employer and the 'representative' of employees to engage in such practices." United States v. Ryan, 350 U.S. 299, 305–306, 76 S.Ct. 400, 404–405, 100 L.Ed. 335 (1956).

We feel that there is ample evidence from which the jury could have found that each of these defendants was guilty beyond a reasonable doubt.

While under the situation just referred to above we do not reverse on factual grounds, for purposes of issues to be dealt with subsequently, we also note that on this lengthy record the evidence establishing willful violation of Sec. 186 by these defendants was not merely ample, it was, in our judgment, overwhelming.

Both appellants also attack the indictments as constitutionally vague and contend that venue was not established in the United States District Court for the Eastern District of Michigan, Southern Division.

■ We believe the indictments were sufficiently clear and specific to meet all constitutional requirements. Defendant Wolff specifically complains that he was charged with paying money to McMaster and that his indictment did not allege the conduit (Ram Transport, Inc.) through which the payments were claim-

ed to have been made. We find no necessity under modern rules of pleading of alleging each step of payments in the indictment. Korholz v. United States of America, 269 F.2d 897, 901 (C.A.10, 1959). Rule 7(a), Federal Rules of Criminal Procedure.

Further, in the McMaster indictment (drawn and filed at the same time) this conduit for payment was spelled out. Defendant Wolff did not move for a bill of particulars prior to trial.

■ We think that defendants were adequately informed of "the nature and cause of the accusation." United States v. Dickerson, 337 F.2d 343 (C.A.6, 1964).

■ As to venue, we believe that deposit of the Youngstown checks in the Ram Transport bank account in Detroit (and collection thereon) was sufficient to represent payment of money in the Eastern District of Michigan.

■ Further, no objection having been made to venue prior to verdict, objection thereto was waived. Cagnina v. United States, 223 F.2d 149 (C.A.5, 1955); Thomas v. United States, 267 F.2d 1 (C.A.5, 1959).

The only substantial claim of error we have found in our review of these briefs and records is that of McMaster pertaining to the admission of an FBI agent's testimony concerning statements made to him by Wolff as set out below:

"Q (By Mr. Merrill) With respect first of all, to June when you talked to him in June, did you discuss with him on that occasion the payments from Youngstown Cartage to Ram Transport?

"A Yes, I did.

"Q Did he indicate to you whether or not such payments had been made?

"A He did.

"Q Did he indicate as to any reason for the making of these payments?

"A Yes, he did.

"Q What did he say with respect to that, in June of 1961?

"A  Mr. Wolff at that time said that these payments were for rental of a tractor type truck for use in the Youngstown Cartage Company Detroit terminal.

"Q  Did he specify what kind of a tractor or its function?

"A  He did not specify the make, the model, the type of tractor.

"Q  Did he indicate as to whether the tractor would be used in the city of Detroit, or would it be used over-the-road?  Did he say anything with respect to that?

"A  He wasn't explicit at that time concerning the rental of the tractor.

"Q  Or as to what the tractor would be used for?

"A  Not at that time.

"Q  Did he indicate the amount of rental that was to be charged for this tractor?

"A  He did not recall what the rental was to be—what the amount of the rental would be for the use of this tractor.

"Q  Did he indicate at that time anything else with regard to the terms of the rental?

"A  He said the terms of this agreement were oral between he and Rolland McMaster—

MR.  NOONAN  (Interposing): Your Honor, I object to that, any statements made by Mr. Wolff concerning Mr. McMaster; purely hearsay as to him."[6]

McMaster claims that it was error for the statement of his co-defendant Wolff to have been admitted against him (McMaster) absent a prompt warning by the trial judge to the jury to disregard Wolff's statement completely as far as defendant McMaster was concerned.

Such an admonition was given later in the Judge's charge.

It is defendant McMaster's contention that the admonition to the jury was too long delayed, (see United States v. Duff,

332 F.2d 702 (C.A.6, 1964)) and inadequate when given.

Appellee on the other hand contends that the admonition was adequate and the error in failing to give it coincidentally with the admission of the statement was not prejudicial within the meaning and purpose of Rule 52(a) of the Federal Rules of Criminal Procedure. Appellee also argues, in effect, that defendant's counsel waived any possible objection.

This last contention is given some weight by the fact that defendant's counsel, after objecting to the testimony on grounds of hearsay, did not request a judicial admonition to the jury that it disregard the testimony as to McMaster, and indeed never did make such a request.  The admonition contained in the charge (which we deem adequate) was requested by the prosecution.  It is also true that Gylph, the FBI agent, was cross-examined extensively by counsel for Wolff as to statements contradictory to the one objected to and that Wolff's subsequent statements to Gylph (generally to the effect that the Youngstown-Ram "lease" agreement was not made with McMaster) went into the record without objection from McMaster's counsel.

Whatever merit the waiver argument may have, we choose not to base decision thereon.  For obviously, McMaster's counsel was presented with a difficult choice as to whether or not to continue to object to hearsay evidence when it was favorable to his client's position.

The evidence quoted was, of course, plainly admissible as to defendant Wolff as a statement against interest.  But as to defendant McMaster's objection on grounds of hearsay, we have another matter.

■  This was not a conspiracy case. Wolff was not an agent of McMaster and the statement (admissible as to Wolff) was not admissible as to McMaster.  4 Wigmore, Evidence, §§ 1076, 1079 (3d ed. 1940).

■  Further, recently in United States v. Duff, supra, we have held that a delay in the giving of an admonition

to the jury to disregard evidence can be prejudicial.

Here there was error in delaying the admonition, and our question is whether this error was an invasion of substantial rights of defendant McMaster or harmless error?

The proposition that jury verdicts shall not be reversed because of harmless error is set forth both in statute[4] and in rule.[5] Nonetheless, in American courts (particularly as distinguished from the English) there is a tendency to give the defendant the benefit of any substantial doubt[6] as to whether the error is harmless—and we have sought here to keep that fact in mind.

Defendant cites Krulewitch v. United States, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 (1949), to us on this point. In Krulewitch we find this discussion:

"It is contended that the statement attributed to the alleged co-conspirator was merely cumulative evidence, that without the statement the case against petitioner was so strong that we should hold the error harmless under 28 U.S.C. (1946 ed.) § 391. In Kotteakos v. United States, 328 U.S. 750, [66 S.Ct. 1239, 90 L.Ed. 1557], we said that error should not be held harmless under the harmless error statute if upon consideration of the record the court is left in grave doubt as to whether the error had substantial influence in bringing about a verdict. We have such doubt here. The Florida District Court grand jury failed to indict. After indictment in New York petitioner was tried four times with the following results: mistrial; conviction; mistrial; conviction

with recommendation for leniency. The revolting type of charges made against this petitioner by the complaining witness makes it difficult to believe that a jury convinced of a strong case against him would have recommended leniency. There was corroborative evidence of the complaining witness on certain phases of the case. But as to all vital phases, those involving the sordid criminal features, the jury was compelled to choose between believing the petitioner or the complaining witness. The record persuades us that the jury's task was difficult at best. We cannot say that the erroneous admission of the hearsay declaration may not have been the weight that tipped the scales against petitioner." Krulewitch v. United States, supra at 444–450, 69 S.Ct. at 719, 93 L.Ed. 790.

On our review of the entire record in McMaster's case, we find this case at the opposite extreme from Krulewitch in the range of criminal appeals claiming error in admission of evidence. Where the court there found "grave doubt" as to guilt, we find (excluding the Wolff statement) that the evidence of McMaster's willful violation of this statute was "overwhelming." Berger v. United States, 295 U.S. 78, 89, 55 S.Ct. 629, 79 L.Ed. 1314 (1935).

We find this case much closer to the factual situation of Lutwak v. United States, 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593 (1953), than to Krulewitch v. United States, supra.

No other meritorious appellate issues are presented.

The convictions are affirmed.

---

4. "Sec. 2111. *Harmless error.*

"On the hearing of any appeal or writ of certiorari in any case, the court shall give judgment after an examination of the record without regard to errors or defects which do not affect the substantial rights of the parties." 28 U.S.C. § 2111.

5. "Rule 52. *Harmless error and plain error.*

"(a) *Harmless error.* Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded." Rule 52 Fed.R.Crim.P.

6. The actual test language employed is, of course, "grave doubt" and "substantial influence" upon the verdict. Kotteakos v. United States, 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).