## KRULEWITCH *v.* UNITED STATES.

No. 143.   Argued January 10, 1949.—Decided March 28, 1949.

*Jacob W. Friedman* argued the cause and filed a brief for petitioner.

*Robert W. Ginnane* argued the cause for the United States.   With him on the brief were *Solicitor General*

*Perlman, Assistant Attorney General Campbell, John R. Benney, Robert S. Erdahl* and *Joseph M. Howard.*

MR. JUSTICE BLACK delivered the opinion of the Court.

A federal district court indictment charged in three counts that petitioner and a woman defendant had (1) induced and persuaded another woman to go on October 20, 1941, from New York City to Miami, Florida, for the purpose of prostitution, in violation of 18 U. S. C. § 399 (now § 2422); (2) transported or caused her to be transported from New York to Miami for that purpose, in violation of 18 U. S. C. § 398 (now § 2421); and (3) conspired to commit those offenses in violation of 18 U. S. C. § 88 (now § 371). Tried alone, the petitioner was convicted on all three counts of the indictment. The Court of Appeals affirmed. 167 F. 2d 943. And see disposition of prior appeal, 145 F. 2d 76. We granted certiorari limiting our review to consideration of alleged error in admission of certain hearsay testimony against petitioner over his timely and repeated objections.

The challenged testimony was elicited by the Government from its complaining witness, the person whom petitioner and the woman defendant allegedly induced to go from New York to Florida for the purpose of prostitution. The testimony narrated the following purported conversation between the complaining witness and petitioner's alleged co-conspirator, the woman defendant.

> "She asked me, she says, 'You didn't talk yet?' And I says, 'No.' And she says, 'Well, don't,' she says, 'until we get you a lawyer.' And then she says, 'Be very careful what you say.' And I can't put it in exact words. But she said, 'It would be better for us two girls to take the blame than Kay (the defendant) because he couldn't stand it, he couldn't stand to take it.'"

The time of the alleged conversation was more than a month and a half after October 20, 1941, the date the complaining witness had gone to Miami. Whatever original conspiracy may have existed between petitioner and his alleged co-conspirator to cause the complaining witness to go to Florida in October, 1941, no longer existed when the reported conversation took place in December, 1941. For on this latter date the trip to Florida had not only been made—the complaining witness had left Florida, had returned to New York, and had resumed her residence there. Furthermore, at the time the conversation took place, the complaining witness, the alleged co-conspirator, and the petitioner had been arrested. They apparently were charged in a United States District Court of Florida with the offense of which petitioner was here convicted.[1]

It is beyond doubt that the central aim of the alleged conspiracy—transportation of the complaining witness to Florida for prostitution—had either never existed or had long since ended in success or failure when and if the alleged co-conspirator made the statement attributed to her. *Cf. Lew Moy* v. *United States,* 237 F. 50. The statement plainly implied that petitioner was guilty of the crime for which he was on trial. It was made in petitioner's absence and the Government made no effort whatever to show that it was made with his authority. The testimony thus stands as an unsworn, out-of-court declaration of petitioner's guilt. This hearsay declaration, attributed to a co-conspirator, was not made pursuant to and in furtherance of objectives of the conspiracy charged in the indictment, because if made, it was after those objectives either had failed or had been achieved. Under these circumstances, the hearsay declaration attributed to the alleged co-conspirator was not admissible

---

[1] The Florida grand jury failed to indict and the cases there were closed without prosecution in February, 1942. The New York indictments were not returned until January, 1943.

on the theory that it was made in furtherance of the alleged criminal transportation undertaking. *Fiswick* v. *United States,* 329 U. S. 211, 216–217; *Brown* v. *United States,* 150 U. S. 93, 98–99; *Graham* v. *United States,* 15 F. 2d 740, 743.

Although the Government recognizes that the chief objective of the conspiracy—transportation for prostitution purposes—had ended in success or failure before the reported conversation took place, it nevertheless argues for admissibility of the hearsay declaration as one in furtherance of a continuing subsidiary objective of the conspiracy. Its argument runs this way. Conspirators about to commit crimes always expressly or implicitly agree to collaborate with each other to conceal facts in order to prevent detection, conviction and punishment. Thus the argument is that even after the central criminal objectives of a conspiracy have succeeded or failed, an implicit subsidiary phase of the conspiracy always survives, the phase which has concealment as its sole objective. The Court of Appeals adopted this view. It viewed the alleged hearsay declaration as one in furtherance of this continuing subsidiary phase of the conspiracy, as part of "the implied agreement to conceal." 167 F. 2d 943, 948. It consequently held the declaration properly admitted.

We cannot accept the Government's contention. There are many logical and practical reasons that could be advanced against a special evidentiary rule that permits out-of-court statements of one conspirator to be used against another. But however cogent these reasons, it is firmly established that where made in furtherance of the objectives of a going conspiracy, such statements are admissible as exceptions to the hearsay rule. This prerequisite to admissibility, that hearsay statements by some conspirators to be admissible against others must be made in furtherance of the conspiracy charged, has been

scrupulously observed by federal courts. The Government now asks us to expand this narrow exception to the hearsay rule and hold admissible a declaration, not made in furtherance of the alleged criminal transportation conspiracy charged, but made in furtherance of an alleged implied but uncharged conspiracy aimed at preventing detection and punishment. No federal court case cited by the Government suggests so hospitable a reception to the use of hearsay evidence to convict in conspiracy cases. The Government contention does find support in some but not all of the state court opinions cited in the Government brief.[2] But in none of them does there appear to be recognition of any such broad exception to the hearsay rule as that here urged. The rule contended for by the Government could have far-reaching results. For under this rule plausible arguments could generally be made in conspiracy cases that most out-of-court statements offered in evidence tended to shield co-conspirators. We are not persuaded to adopt the Government's implicit conspiracy theory which in all criminal conspiracy cases would create automatically a further breach of the general rule against the admission of hearsay evidence.

It is contended that the statement attributed to the alleged co-conspirator was merely cumulative evidence, that without the statement the case against petitioner was so strong that we should hold the error harmless under 28 U. S. C. (1946 ed.) § 391. In *Kotteakos* v. *United States,* 328 U. S. 750, we said that error should not be held harm-

---

[2] *Commonwealth* v. *Smith,* 151 Mass. 491, 24 N. E. 677; *People* v. *Mol,* 137 Mich. 692, 707, 100 N. W. 913, 918; *Hooper* v. *State,* 187 Ark. 88, 92, 58 S. W. 2d 434, 435; *State* v. *Gauthier,* 113 Ore. 297, 307, 231 P. 141, 145; *State* v. *Emory,* 116 Kan. 381, 384, 226 P. 754, 756; *Carter* v. *State,* 106 Ga. 372, 376, 32 S. E. 345, 346–347; *Watson* v. *State,* 166 Miss. 194, 213, 146 So. 122, 127; *Baldwin* v. *State,* 46 Fla. 115, 120–121, 35 So. 220, 222; *State* v. *Strait,* 279 S. W. 109 (Mo.).

less under the harmless error statute if upon consideration of the record the court is left in grave doubt as to whether the error had substantial influence in bringing about a verdict. We have such doubt here. The Florida District Court grand jury failed to indict. After indictment in New York petitioner was tried four times with the following results: mistrial; conviction; mistrial; conviction with recommendation for leniency. The revolting type of charges made against this petitioner by the complaining witness makes it difficult to believe that a jury convinced of a strong case against him would have recommended leniency. There was corroborative evidence of the complaining witness on certain phases of the case. But as to all vital phases, those involving the sordid criminal features, the jury was compelled to choose between believing the petitioner or the complaining witness. The record persuades us that the jury's task was difficult at best. We cannot say that the erroneous admission of the hearsay declaration may not have been the weight that tipped the scales against petitioner.

*Reversed.*

MR. JUSTICE JACKSON, concurring in the judgment and opinion of the Court.

This case illustrates a present drift in the federal law of conspiracy which warrants some further comment because it is characteristic of the long evolution of that elastic, sprawling and pervasive offense. Its history exemplifies the "tendency of a principle to expand itself to the limit of its logic." [1] The unavailing protest of courts against the growing habit to indict for conspiracy in lieu of prosecuting for the substantive offense itself, or in

---

[1] The phrase is Judge Cardozo's—*The Nature of the Judicial Process*, p. 51.

446

addition thereto,[2] suggests that loose practice as to this offense constitutes a serious threat to fairness in our administration of justice.

The modern crime of conspiracy is so vague that it almost defies definition.[3] Despite certain elementary and

[2] The Conference of Senior Circuit Judges, presided over by Chief Justice Taft, in 1925 reported:

"We note the prevalent use of conspiracy indictments for converting a joint misdemeanor into a felony; and we express our conviction that both for this purpose and for the purpose—or at least with the effect—of bringing in much improper evidence, the conspiracy statute is being much abused.

"Although in a particular case there may be no preconcert of plan, excepting that necessarily inherent in mere joint action, it is difficult to exclude that situation from the established definitions of conspiracy; yet the theory which permits us to call the aborted plan a greater offense than the completed crime supposes a serious and substantially continued group scheme for cooperative law breaking. We observe so many conspiracy prosecutions which do not have this substantial base that we fear the creation of a general impression, very harmful to law enforcement, that this method of prosecution is used arbitrarily and harshly. Further the rules of evidence in conspiracy cases make them most difficult to try without prejudice to an innocent defendant." Annual Report of the Attorney General for 1925, pp. 5–6.

Fifteen years later Judge Learned Hand observed: ". . . so many prosecutors seek to sweep within the drag-net of conspiracy all those who have been associated in any degree whatever with the main offenders. That there are opportunities of great oppression in such a doctrine is very plain, and it is only by circumscribing the scope of such all comprehensive indictments that they can be avoided." *United States* v. *Falcone*, 109 F. 2d 579, 581.

[3] Harno, *Intent in Criminal Conspiracy*, 89 U. of Pa. L. Rev. 624: "In the long category of crimes there is none, not excepting criminal attempt, more difficult to confine within the boundaries of definitive statement than conspiracy."

An English author—Wright, *The Law of Criminal Conspiracies and Agreements*, p. 11—gives up with the remark: "but no intelligible definition of 'conspiracy' has yet been established."

essential elements,[4] it also, chameleon-like, takes on a special coloration from each of the many independent offenses on which it may be overlaid.[5]  It is always "pre-

---

[4] Justice Holmes supplied an oversimplified working definition in *United States* v. *Kissel*, 218 U. S. 601, 608: "A conspiracy is a partnership in criminal purposes." This was recently restated "A conspiracy is a partnership in crime." *Pinkerton* v. *United States*, 328 U. S. 640, 644.  The latter is inaccurate, since concert in criminal purposes, rather than concert in crime, establishes the conspiracy.

Carson offers the following résumé of American cases: "It would appear that a conspiracy must be a combination of two or more persons by some concerted action to accomplish some criminal object; or some object not criminal by criminal means; or, some object not criminal by means which are not criminal, but where mischief to the public is involved; or, where neither the object nor the means are criminal, or even unlawful, but where injury and oppression to individuals are the result." *The Law of Criminal Conspiracies and Agreements, as Found in The American Cases*, p. 123.

[5] See, for example:

8 U. S. C. § 47, Conspiracy to interfere with civil rights; (1) Preventing officer from performing duties; (2) Obstructing justice, intimidating party, witness, or juror; (3) Depriving persons of rights or privileges.   10 U. S. C. § 1566, Conspiracy by persons in military service to defraud the U. S.   12 U. S. C. § 1138d (f), Conspiracy involving Farm Credit Banks, Administration, etc.   15 U. S. C.: §§ 1–3, Conspiracy in restraint of trade; § 8, Conspiracy in restraint of import trade.   18 U. S. C. as revised by the Act of June 25, 1948, 62 Stat. 928 *et seq.*, effective September 1, 1948: § 2384, Seditious conspiracy; §§ 2385, 2387, Conspiracy to impair loyalty of armed forces or advocate overthrow of U. S. Government by force; § 241, Conspiracy to injure person in exercise of civil rights; § 372, Conspiracy to prevent officer from performing duties; § 286, Conspiracy to defraud the Government by obtaining payment of a false claim; § 371, Conspiracy to defraud the United States; §§ 1501–1506, Conspiracy to obstruct justice; §§ 752, 1792, Conspiracy to cause riots at federal penal institutions; § 1201, Conspiracy to transport kidnapped person in interstate commerce; § 2314, Conspiracy to transport stolen property and counterfeiting instruments in interstate commerce; § 1951, Conspiracy to violate Anti-Racketeering Act;

dominantly mental in composition" because it consists primarily of a meeting of minds and an intent.[6]

The crime comes down to us wrapped in vague but unpleasant connotations. It sounds historical undertones of treachery, secret plotting and violence on a scale that menaces social stability and the security of the state itself. "Privy conspiracy" ranks with sedition and rebellion in the Litany's prayer for deliverance. Conspiratorial movements do indeed lie back of the political assassination, the *coup d'état*, the *putsch*, the revolution, and seizures of power in modern times, as they have in all history.[7]

But the conspiracy concept also is superimposed upon many concerted crimes having no political motivation. It is not intended to question that the basic conspiracy principle has some place in modern criminal law, because to unite, back of a criminal purpose, the strength, opportunities and resources of many is obviously more dangerous and more difficult to police than the efforts of a

---

§ 2192, Conspiracy to incite mutiny on shipboard; § 2271, Conspiracy to cast away vessel. 22 U. S. C. § 234, Conspiracy to injure property of foreign government. 31 U. S. C. § 231, Conspiracy to obtain payment of false claims. 34 U. S. C. § 749a, Conspiracy to bid collusively on construction of naval aircraft. 38 U. S. C. § 715, Conspiracy to falsify pension claims. 50 U. S. C. § 34, Conspiracy to disclose national defense information or commit espionage. 50 U. S. C. App. § 311, Conspiracy to violate Selective Service Act.

[6] Harno, *Intent in Criminal Conspiracy*, 89 U. of Pa. L. Rev. 624, 632.

[7] See Senturia, *Conspiracy, Political*, IV Encyc. Soc. Sci. 238 (1931).

On conspiracy principles German courts, on May 30, 1924, adjudged the Nazi Party to be a criminal organization. It also held in 1928 that the Leadership Corps of the Communist Party was a criminal organization and in 1930 entered judgment of criminality against the Union of Red Front Fighters of the Communist Party. See note 15.

lone wrongdoer.[8] It also may be trivialized, as here, where the conspiracy consists of the concert of a loathsome panderer and a prostitute to go from New York to Florida to ply their trade (see 145 F. 2d 76 for details) and it would appear that a simple Mann Act prosecution would vindicate the majesty of federal law. However, even when appropriately invoked, the looseness and pliability of the doctrine present inherent dangers which should be in the background of judicial thought wherever it is sought to extend the doctrine to meet the exigencies of a particular case.

Conspiracy in federal law aggravates the degree of crime over that of unconcerted offending. The act of confederating to commit a misdemeanor, followed by even an innocent overt act in its execution, is a felony and is such even if the misdemeanor is never consummated.[9] The more radical proposition also is well-established that at common law and under some statutes a combination may be a criminal conspiracy even if it contemplates only acts which are not crimes at all when perpetrated by an individual or by many acting severally.[10]

---

[8] 8 Holdsworth, *History of English Law,* 383. Miller, *Criminal Law,* p. 110.

[9] 18 U. S. C. A. § 371. Until recently, the punishment for such a felony could have been far in excess of that provided for the substantive offense. However, the Act of June 25, 1948, c. 645, 62 Stat. 683, 701, provides that in such a case the punishment for the conspiracy shall not exceed the maximum provided for such misdemeanor.

[10] This is the federal law applicable to antitrust prosecutions. For the history of this conception and its perversion, particularly in labor cases, see Sayre, *Criminal Conspiracy,* 35 Harv. L. Rev. 393. On the abuse of conspiracy see O'Brian, *Loyalty Tests and Guilt by Association,* 61 Harv. L. Rev. 592, and Note, *The Conspiracy Dilemma: Prosecution of Group Crime or Protection of Individual Defendants,* 62 Harv. L. Rev. 276.

Thus the conspiracy doctrine will incriminate persons on the fringe of offending who would not be guilty of aiding and abetting or of becoming an accessory, for those charges only lie when an act which is a crime has actually been committed.[11]

Attribution of criminality to a confederation which contemplates no act that would be criminal if carried out by any one of the conspirators is a practice peculiar to Anglo-American law. "There can be little doubt that this wide definition of the crime of conspiracy originates in the criminal equity administered in the Star Chamber."[12] In fact, we are advised that "The modern crime of conspiracy is almost entirely the result of the manner in which conspiracy was treated by the court of Star Chamber."[13] The doctrine does not commend itself to jurists of civil-law countries,[14] despite universal recognition that an organized society must have legal weapons for combatting organized criminality. Most other countries have devised what they consider more discriminating principles upon which to prosecute criminal gangs, secret associations and subversive syndicates.[15]

---

[11] This statement, of course, leaves out of account the subject of attempts with which conspiracy is said to be allied. 8 Holdsworth, *History of English Law,* 382.

[12] *Id.,* 382.

[13] *Id.,* 379.

[14] "It is utterly unknown to the Roman law; it is not found in modern Continental codes; few Continental lawyers ever heard of it. It is a fortunate circumstance that it is not encrusted so deep in our jurisprudence by past decisions of our courts that we are unable to slough it off altogether. It is a doctrine which has proved itself the evil genius of our law wherever it has touched it." Sayre, *Criminal Conspiracy,* 35 Harv. L. Rev. 393, 427.

[15] Counsel representing the United States, the United Kingdom, the French Republic, and the Soviet Union, and German defendants, indulged in some comparisons of the relevant laws of several nations

A recent tendency has appeared in this Court to expand this elastic offense and to facilitate its proof. In *Pinkerton* v. *United States,* 328 U. S. 640, it sustained a conviction of a substantive crime where there was no proof of participation in or knowledge of it, upon the novel and dubious theory that conspiracy is equivalent in law to aiding and abetting.

Doctrines of conspiracy are not only invoked for criminal prosecution, but also in civil proceedings for damages or for injunction, and in administrative proceedings to apply regulatory statutes. They have been resorted to by military commissions and on at least one notable occasion when civil courts were open at the time and place to punish the offense.[16] This conspiracy concept was employed to prosecute laborers for combining to raise their wages and formed the basis for abuse of the labor injunction.[17] The National Labor Relations Act found it necessary to provide that concerted labor activities otherwise lawful were not rendered unlawful by mere concert.[18] But in other fields concert may still be a crime though it contemplates only acts which each could do lawfully on his own.

The interchangeable use of conspiracy doctrine in civil as well as penal proceedings opens it to the danger, absent in the case of many crimes, that a court having in mind

---

before the International Military Tribunal at Nürnberg in connection with organizations there accused as criminal. 8 Trial of Major War Criminals (GPO 1947), pp. 353, *et seq.;* 2 Nazi Conspiracy and Aggression (GPO 1946), p. 1; Jackson, *The Nürnberg Case,* p. 95.

[16] The Assassination of President Lincoln and the Trial of the Conspirators, New York, 1865. See, however, *Ex parte Milligan,* 4 Wall. 2.

[17] See Sayre, *Criminal Conspiracy,* 35 Harv. L. Rev. 393, 403.

[18] *International Union, U. A. W. A.* v. *Wisconsin Employment Relations Board, ante,* p. 245.

only the civil sanctions will approve lax practices which later are imported into criminal proceedings. In civil proceedings this Court frankly has made the end a test of the means, saying, "To require a greater showing would cripple the Act," *United States* v. *Griffith,* 334 U. S. 100, in dispensing with the necessity for specific intent to produce a result violative of the statute. Further, the Court has dispensed with even the necessity to infer any definite agreement, although that is the gist of the offense. "It is elementary that an unlawful conspiracy may be and often is formed without simultaneous action or agreement on the part of the conspirators. . . ." *United States* v. *Masonite Corp.,* 316 U. S. 265, 275. One might go on from the reports of this and lower courts and put together their decisions condoning absence of proof to demonstrate that the minimum of proof required to establish conspiracy is extremely low, and we may expect our pronouncements in civil cases to be followed in criminal ones also.

Of course, it is for prosecutors rather than courts to determine when to use a scatter-gun to bring down the defendant, but there are procedural advantages from using it which add to the danger of unguarded extension of the concept.

An accused, under the Sixth Amendment, has the right to trial "by an impartial jury of the State and district wherein the crime shall have been committed." The leverage of a conspiracy charge lifts this limitation from the prosecution and reduces its protection to a phantom, for the crime is considered so vagrant as to have been committed in any district where any one of the conspirators did any one of the acts, however innocent, intended to accomplish its object.[19] The Government may, and often

---

[19] *Hyde* v. *United States,* 225 U. S. 347. Mr. Justice Holmes, on behalf of himself and Justices Hughes, Lurton and Lamar, wrote

does, compel one to defend at a great distance from any place he ever did any act because some accused confederate did some trivial and by itself innocent act in the chosen district. Circumstances may even enable the prosecution to fix the place of trial in Washington, D. C., where a defendant may lawfully be put to trial before a jury partly or even wholly made up of employees of the Government that accuses him. *Cf. Frazier* v. *United States,* 335 U. S. 497.

When the trial starts, the accused feels the full impact of the conspiracy strategy. Strictly, the prosecution should first establish *prima facie* the conspiracy and identify the conspirators, after which evidence of acts and declarations of each in the course of its execution are admissible against all. But the order of proof of so sprawling a charge is difficult for a judge to control. As a practical matter, the accused often is confronted with a hodgepodge of acts and statements by others which he may never have authorized or intended or even known about, but which help to persuade the jury of existence of the conspiracy itself. In other words, a conspiracy often is proved by evidence that is admissible only upon assumption that conspiracy existed. The naive assumption that prejudicial effects can be overcome by instructions to the jury, *cf. Blumenthal* v. *United States,* 332 U. S. 539, 559, all practicing lawyers know to be unmitigated fiction. See *Skidmore* v. *Baltimore & Ohio R. Co.,* 167 F. 2d 54.

The trial of a conspiracy charge doubtless imposes a heavy burden on the prosecution, but it is an especially difficult situation for the defendant. The hazard from loose application of rules of evidence is aggravated where

a vigorous protest which did not hesitate to brand the doctrine as oppressive and as "one of the wrongs that our forefathers meant to prevent." 225 U. S. 347, 387.

the Government institutes mass trials.[20]  Moreover, in federal practice there is no rule preventing conviction on uncorroborated testimony of accomplices, as there are in many jurisdictions, and the most comfort a defendant can expect is that the court can be induced to follow the "better practice" and caution the jury against "too much reliance upon the testimony of accomplices." *Caminetti* v. *United States*, 242 U. S. 470, 495.

A co-defendant in a conspiracy trial occupies an uneasy seat.  There generally will be evidence of wrongdoing by somebody.  It is difficult for the individual to make his own case stand on its own merits in the minds of jurors who are ready to believe that birds of a feather are flocked together.  If he is silent, he is taken to admit it and if, as often happens, co-defendants can be prodded into accusing or contradicting each other, they convict each other.  There are many practical difficulties in defending against a charge of conspiracy which I will not enumerate.[21]

Against this inadequately sketched background, I think the decision of this case in the court below intro-

---

[20] An example is afforded by *Allen* v. *United States*, 4 F. 2d 688. At the height of the prohibition frenzy, seventy-five defendants were tried on charges of conspiracy.  A newspaper reporter testified to going to a drinking place where he talked with a woman, behind the bar, whose name he could not give.  There was not the slightest identification of her nor showing that she knew or was known by any defendant.  But it was held that being back of the bar showed her to be a co-conspirator and, hence, her statements were admissible against all.  He was allowed to relate incriminating statements made by her.

[21] For courtroom technique employed in the trial of conspiracy cases by both prosecution and defense, see O'Dougherty, *Prosecution and Defense under Conspiracy Indictments,* 9 Brooklyn L. Rev. 263. His survey, which accords with our observation, will hardly convince one that a trial of this kind is the highest exemplification of the working of the judicial process.

duced an ominous expansion of the accepted law of conspiracy. The prosecution was allowed to incriminate the defendant by means of the prostitute's recital of a conversation with defendant's alleged co-conspirator, who was not on trial. The conversation was said to have taken place after the substantive offense was accomplished, after the defendant, the co-conspirator and the witness had all been arrested, and after the witness and the other two had a falling out. The Court of Appeals sustained its admission upon grounds stated as follows:

> ". . . We think that implicit in a conspiracy to violate the law is an agreement among the conspirators to conceal the violation after as well as before the illegal plan is consummated. Thus the conspiracy continues, at least for purposes of concealment, even after its primary aims have been accomplished. The statements of the co-conspirator here were made in an effort to protect the appellant by concealing his role in the conspiracy. Consequently, they fell within the implied agreement to conceal and were admissible as evidence against the appellant. Cf. United States v. Goldstein, 2 Cir., 135 F. 2d 359; Murray v. United States, 7 Cir., 10 F. 2d 409, certiorari denied, 271 U. S. 673 . . . . While Bryan v. United States, 5 Cir., 17 F. 2d 741, is by implication directly to the contrary, we decline to follow it."

I suppose no person planning a crime would accept as a collaborator one on whom he thought he could not rely for help if he were caught, but I doubt that this fact warrants an inference of conspiracy for that purpose. Of course, if an understanding for continuous aid had been proven, it would be embraced in the conspiracy

by evidence and there would be no need to imply such an agreement. Only where there is no convincing evidence of such an understanding is there need for one to be implied.

It is difficult to see any logical limit to the "implied conspiracy," either as to duration or means, nor does it appear that one could overcome the implication by express and credible evidence that no such understanding existed, nor any way in which an accused against whom the presumption is once raised can terminate the imputed agency of his associates to incriminate him. Conspirators, long after the contemplated offense is complete, after perhaps they have fallen out and become enemies, may still incriminate each other by deliberately harmful, but unsworn declarations, or unintentionally by casual conversations out of court. On the theory that the law will impute to the confederates a continuing conspiracy to defeat justice, one conceivably could be bound by another's unauthorized and unknown commission of perjury, bribery of a juror or witness, or even putting an incorrigible witness with damaging information out of the way.

Moreover, the assumption of an indefinitely continuing offense would result in an indeterminate extension of the statute of limitations. If the law implies an agreement to cooperate in defeating prosecution, it must imply that it continues as long as prosecution is a possibility, and prosecution is a possibility as long as the conspiracy to defeat it is implied to continue.

I do not see the slightest warrant for judicially introducing a doctrine of implied crimes or constructive conspiracies. It either adds a new crime or extends an old one. True, the modern law of conspiracy was largely evolved by the judges. But it is well and wisely settled that there can be no judge-made offenses against the

United States and that every federal prosecution must be sustained by statutory authority.[22] No statute authorizes federal judges to imply, presume or construct a conspiracy except as one may be found from evidence. To do so seems to approximate creation of a new offense and one that I would think of doubtful constitutionality even if it were created by Congress.[23] And, at all events, it is one fundamentally and irreconcilably at war with our presumption of innocence.

There is, of course, strong temptation to relax rigid standards when it seems the only way to sustain convictions of evildoers. But statutes authorize prosecution for substantive crimes for most evil-doing without the dangers to the liberty of the individual and the integrity of the judicial process that are inherent in conspiracy charges. We should disapprove the doctrine of implied or constructive crime in its entirety and in every manifestation. And I think there should be no straining to uphold any conspiracy conviction where prosecution for the substantive offense is adequate and the purpose served by adding the conspiracy charge seems chiefly to get procedural advantages to ease the way to conviction.

Although a reversal after four trials is, of course, regrettable, I cannot overlook the error as a harmless one. But I should concur in reversal even if less sure that prejudice resulted, for it is better that the crime go unwhipped of justice than that this theory of implied continuance of conspiracy find lodgment in our law, either by affirmance or by tolerance. Few instruments of in-

---

[22] *United States* v. *Hudson,* 7 Cranch 32; *United States* v. *Worrall,* 2 Dall. 384; *United States* v. *Coolidge,* 1 Wheat. 415; *United States* v. *Eaton,* 144 U. S. 677, 687; *United States* v. *Bathgate,* 246 U. S. 220, 225. See, however, Warren, *New Light on the History of the Federal Judiciary Act of 1789,* 37 Harv. L. Rev. 49, 73.

[23] *Cf. Tot* v. *United States,* 319 U. S. 463.

justice can equal that of implied or presumed or constructive crimes. The most odious of all oppressions are those which mask as justice.

MR. JUSTICE FRANKFURTER and MR. JUSTICE MURPHY join in this opinion.

MR. JUSTICE BURTON, dissenting.

While I agree with the opinion of the Court that the hearsay testimony in question was not properly admissible, I regard its admission, under the circumstances of this case, as an absolutely harmless error.

In speaking of harmless errors that may result from the admission of evidence, this Court has said:

"Errors of this sort in criminal causes conceivably may be altogether harmless in the face of other clear evidence, although the same error might turn scales otherwise level, as constantly appears in the application of the policy of § 269* to questions of the admission of cumulative evidence." *Kotteakos* v. *United States,* 328 U. S. 750, 763.

---

*Section 269 of the Judicial Code, as then in effect, and as in effect at the time of the trial of the instant case and of the entry of the judgment below, provided:

"SEC. 269. . . . On the hearing of any appeal, certiorari, writ of error, or motion for a new trial, in any case, civil or criminal, the court shall give judgment after an examination of the entire record before the court, without regard to technical errors, defects, or exceptions which do not affect the substantial rights of the parties." 40 Stat. 1181, 28 U. S. C. § 391.

Rule 52 (a) of the Federal Rules of Criminal Procedure, as continuously in effect during and since the time of the trial of the instant case and as still in effect, provides:

"RULE 52. HARMLESS ERROR AND PLAIN ERROR.

"(a) HARMLESS ERROR. Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded. . . ."

Again, in determining whether error in the admission of evidence should result in a reversal of a judgment, we said that the question is—

"what effect the error had or reasonably may be taken to have had upon the jury's decision. . . .

.         .         .         .         .

"If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand, except perhaps where the departure is from a constitutional norm or a specific command of Congress." *Id.* at pp. 764–765.

The issue before us involves no constitutional question or specific command of Congress. The trial was a long one concerning personal conduct involving simple issues of fact. The record of it covers more than 800 pages. The jury must have been thoroughly familiar with the issues and with the degree of dependability, if any, to be placed upon the oral testimony of the petitioner and of the two witnesses involved in the conversation that is before us as reported by one of them. The evidence supporting the jury's verdict was cumulative, repetitive and corroborated to such a point that I cannot believe that the verdict or the rights of the parties could have been appreciably affected by such weight as the jury may have attached to this reported snatch of conversation between two people of such negligible dependability as was demonstrated here. After this extended fourth trial, to set aside this jury's verdict merely because of this particular bit of hearsay testimony seems to me to be an unrealistic procedure that tends to make a travesty of the jury system which is neither necessary nor deserved. I would affirm the judgment below.