Eugene Deikman and Richard E. Hartman, Denver, Colo., for defendants.

**UNITED STATES of America,
Plaintiff,**

v.

**Arthur MARES and Albert Mares,
Defendants.**

**Cr. A. No. 66–CR–81.**

United States District Court
D. Colorado.

Nov. 15, 1966.

### MEMORANDUM OPINION
### AND ORDER

WILLIAM E. DOYLE, District Judge.

The defendants herein have filed motions for judgment of acquittal notwithstanding the verdict, or, in the alternative, for a new trial. Oral arguments have been held on these motions and they now stand submitted.

Numerous points have been raised in the motions, but the only question which requires comment is the action of the Court in receiving in evidence acts and accompanying statements of the defendants soon after the alleged robbery. Inasmuch as the admissibility of these statements depends in part at least on the factual background and basis, it becomes necessary to relate the facts in some detail. The defendants are charged with the robbery of a Building and Loan Society in Denver on Monday, April 4,

1966. The charge also contains an allegation that the defendants employed guns in the perpetration of the said robbery. There were separate trials due to the intent of the Government to offer the testimony of the wife of one defendant against the other. This witness did not testify and the trial could have been a joint one.

The case is basically a circumstantial one and the Government painstakingly traced the activities and movements of the two defendants who are closely related.

On April 4, 1966, shortly after twelve o'clock noon, two armed masked men entered the Key Savings and Loan Association at the Alameda Shopping Center in Denver. At the time there were no customers in the bank, but the Branch Manager was present at the deposit window. His assistant was then in the back room eating lunch. The two men had nickle or light-colored metal revolvers. The Manager was ordered to lie face down on the floor and the assistant was brought in from the back room at gunpoint and ordered to lie face down on the floor. The robbers then proceeded to rifle the cash drawers and obtained some $5,000.00 in currency, silver and checks.

The two defendants were identified as having been near the scene at or about the time of the robbery. A witness at a nearby store identified them as having been loitering in the store. While in the bank they wore knitted ski masks over their faces. These masks covered their faces and rendered it impossible to identify the two men positively. Less than positive identifications were made by the personnel of the bank. They picked them out of police line-ups as did the witness from the nearby store referred to above.

The proprietor of a pawn shop identified both defendants as having been present while a nickle-plated Ivor Johnson Revolver was sold to a man accompanying them. This incident occurred on March 31, 1966, a few days prior to the robbery.

There was evidence showing that prior to the incident both men were in dire financial straits being in need of money for the purpose of satisfying pressing demands and desires. However, in a matter of a few hours after the robbery both defendants were shown to have had ample cash. Arthur Mares retrieved the vehicle of Albert at a repair shop and paid a substantial bill and used currency to satisfy the obligation. At the time he displayed in addition a one-hundred dollar bill and stated that the source of the funds was an income tax rebate of Albert.

A few hours after the robbery the two defendants appeared with their girl friends at downtown stores and made extensive purchases of luxury items of clothing and toilet articles.

The Federal Bureau of Investigation meticulously investigated the movements of the defendants on the day of the robbery and produced evidence to establish opportunity to carry it out.

In the Albert Mares trial there was evidence that smoke came out of an incinerator at the rear of his wife's home soon after the robbery. The F.B.I. discovered evidence of burned knitted material in this incinerator soon after the incident.

Although the defendants were not arrested immediately after the offense, they were investigation subjects soon after the incident. The testimony in question consisted of descriptions of acts and accompanying statements which were given during the period prior to the arrest of the defendants. Most of these occurred on the day of the offense or the day following. Both men were shown to have engaged in concealment efforts. For example: the clothing purchased was carefullly concealed; also, a quantity of silver was concealed at the behest of one of the defendants. Explanations (shown by the prosecution to be false) as to the source of the money were related and communications between them or people acting for them, were given. All of these statements were spontaneous. Most such conversations

accompanied and explained acts and none of them were narrative acknowledgments of the commission of the offense. In other words, they were statements which did not have the effect of directly proving the crime, but were circumstances from which inferences as to involvement could logically be drawn.

This is a mere outline of the circumstances and does not purport to fully detail the numerous items and pieces of evidence which were offered. It sufficiently shows, however, that there was ample independent evidence to establish the *corpus delicti* of the offense and that the defendants were confederates in the robbery of a bank, and that they continued to act in concert as an aftermath of the actual robbery.

Counsel for the defendants has urged the proposition that any statement of a confederate in a robbery case made subsequent to the actual robbery is barred if the statement is made outside the presence of his confederate. In essence, he urges that even prior to arrest and notwithstanding that the statements are not offered testimonially, and even though they are non-narrative statements, and regardless of whether they are related in time and space to the commission of the offense, and irrespective of probative value they must be excluded if the statements were not made incident to the holding of the guns and the taking of the money itself. Because the law is not altogether clear on this, we have devoted careful attention to the cases with a view to determining whether the evidence in question was properly received.

In the Arthur Mares case the motion for new trial describes the evidence complained of as follows:

"* * * Said evidence included the testimony of Mary Valdez that she told Albert Mares that Lucy Marcias said that four policemen were over at her house and to get rid of the stuff. Whereupon, Albert Mares was quoted as saying:

"'S – – t, how did they find that out?'

"This evidence the Court characterized, in the subsequent trial of Albert Mares, as 'most probative.'"

In the Albert Mares motion for new trial, it is described as follows:

"* * * Said evidence included the testimony of Lorraine Griego that Arthur Mares said that Albert and Arthur Mares had received money from income tax refunds, that Arthur Mares told her to take Lucy Macias' purse containing $30.00 in change and hide it, that Arthur Mares told her to inform the FBI that the new shirts belonged to Bob Martinez, and similar incriminatory utterances quoted by said witness. Said testimony included the evidence of the witness Beck that Arthur Mares told him that the $100.00 bill in his possession was for rent money, and that Albert had gotten an income tax refund. Also included in such inadmissible testimony, was the evidence of Mr. & Mrs. Valdez concerning similar statements on the part of Arthur Mares."

Defendants attack the reception of the above described evidence on the basis that: *first,* the statements were not in furtherance of any conspiracy; *secondly,* no conspiracy was charged, and *thirdly,* that the evidence failed to establish independent of the alleged incriminatory statements that a conspiracy existed.

In support of their contention that the evidence received was not in furtherance of a conspiracy, defendants rely upon the decision of the Supreme Court in Krulewitch v. United States, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 (1949). In *Krulewitch* the Court distinguished between statements made in furtherance of a *going* conspiracy, which statements are admissible as exceptions to the hearsay rule and statements made after the termination of the conspiracy. Subsequent distinct conspiracies to avoid arrest were condemned. There the Government had urged that the statements offered were made during the "continuing subsidiary phase" of the conspiracy, as part of an implied agreement between defendants to conceal their acts. The

Supreme Court, through Mr. Justice Black, held that statements which were made more than a month and a half after the day of the alleged Mann Act violation and after the complaining witness had returned from her illicit interstate trip, and after she, the alleged co-conspirator and the petitioner *had been arrested,* occurred after the conspiracy had ended.

*Krulewitch* recognizes that there is a tendency to misuse the conspiracy concept to cover the introduction of otherwise incompetent evidence. The entire idea is founded on agency and there can be no agency after the enterprise has been completed and the participants have separated or have been arrested. We do not construe *Krulewitch* as holding that the relationship ends automatically and as a matter of law when the substantive offense is completed; when, for example, the robbers have captured the last item of loot from the victims.

The early decision of the Supreme Court in Logan v. United States, 144 U.S. 263, 12 S.Ct. 617, 36 L.Ed. 429, excludes statements made after the conspiracy has come to an end "whether by success or by failure" and states that the admissions of one conspirator "by way of narrative and past facts" are not admissible in evidence against the others.

That this continues to be the law is shown by recent decisions of the Tenth Circuit. Thus, in Cleaver v. United States, 10 Cir. 1956, 238 F.2d 766, the Court of Appeals said:

"  *  *  *  the termination of the conspiracy need not coincide with the completion of the crime nor even with the arrest of a conspirator. Ferris v. United States, 9 Cir., 40 F.2d 837. The time when a continuing conspiracy terminates depends upon the particular facts and purposes of such conspiracy. *Completion of the object of the conspiracy completes the conspiracy.* This varies with different offenses but a conspiracy to commit a crime of stealth for material gain usually has a minimum routine development from plan to commission to division of fruits, if any, among the conspirators.

*  *  * " 238 F.2d 769. [Emphasis supplied.]

Also, in Kelley v. United States, 10 Cir. 1966, 364 F.2d 911, it was recognized that the conspiracy continued to be operative the day after the robbery at which time Kelley and his associate, Glidewell, were apprehended while in the process of destroying incriminating evidence. The Court there said:

" *  *  * Any circumstance probative of the guilt of Kelley was admissible. He and Glidewell were found in the process of destroying incriminating evidence which had been transported to an isolated spot in an automobile rented by Glidewell. Although Glidewell was not tried with Kelley for the crime, the prosecution was not prohibited from showing that he participated with Kelley in the theft. The jury could infer from the evidence that Kelley and Glidewell were associated in the theft of the Wiley bank. Acts of each associate which were done to accomplish their objective were admissible against the other, although no conspiracy was charged. Bartlett v. United States, 10 Cir., 166 F.2d 920; Lee Dip v. United States, 9 Cir., 92 F.2d 802, cert. denied 303 U.S. 638, 58 S.Ct. 526, 82 L.Ed. 1099; Cossack v. United States, 9 Cir., 82 F.2d 214, cert. denied 298 U.S. 654, 56 S.Ct. 678, 80 L.Ed. 1381, 298 U.S. 678, 56 S.Ct. 949, 80 L.Ed. 1399, reh. denied 298 U.S. 691, 56 S.Ct. 750, 80 L.Ed. 1409; Vilson v. United States, 9 Cir., 61 F.2d 901; Robinson v. United States, 9 Cir., 33 F.2d 238. Accordingly, any reference to the stolen money found in the possession of Glidewell could not have been prejudicial to Kelley. See Self v. United States, 5 Cir., 249 F.2d 32."

Most recently, in Woodring v. United States, 10 Cir. 1966, 367 F.2d 968, the Court of Appeals distinguished between narrative and conspiratorial communications. There the District Court had received a statement of one co-conspirator made to the police after arrest. The

judgment was reversed on this account, the Court of Appeals saying:

"* * * However at the time the statements were made the record shows that the appellant, his codefendant, and Miss Hill had been arrested and jailed, and the car and the checks seized by the police. Statements made by Miss Hill thereafter could not be in furtherance of the conspiracy nor of its objects because it had come to an end. On very similar facts we expressly so held in Gay v. United States, 322 F.2d 208 (10th Cir.), and held also the admission of such postconspiracy statements was reversible error. When the conspiracy ends the theory that the participants are agents for each other has no further validity, and statements thereafter made, are not admissible against the others. Such statements are then no different from any other hearsay. Greer v. United States, 227 F.2d 546 (10th Cir.). '* * * After the conspiracy has come to an end, * * * the admissions of one conspirator, by way of narrative of past facts, are not admissible in evidence against the others.' Logan v. United States, 144 U.S. 262, 12 S.Ct. 617, 36 L.Ed. 429; Cleaver v. United States, 238 F.2d 766 (10th Cir.). The ending of a conspiracy depends upon the particular facts. Cleaver v. United States, supra. The conspiracy here charged had ended because all the named conspirators were in jail, the car seized, and the checks seized."

The other circuits have taken similar views. See United States v. Tarricone, 2 Cir. 1957, 242 F.2d 555 and Atkins v. United States, 9 Cir. 1962, 307 F.2d 937. In *Atkins* the statement complained of was somewhat narrative in character and yet the court upheld the conviction. It is doubtful whether the Tenth Circuit would go so far as the decision in *Atkins*.

Discussions in recent Law Review notes confirm this view of the law. An article by Joseph H. Levie, entitled "Hearsay and Conspiracy" in 52 Michigan Law Review 1159, 1178, emphasizes that the declaration in question must be made during the continuation of the conspiracy, must be in furtherance of the conspiracy, and must be predicated on independent proof of its existence.

The liberal and conservative viewpoints are described in an extensive note reported in 72 Harvard Law Review 920, 985. The author points out that both the model code of evidence and the uniform rules of evidence have adopted a liberal standard which permits statements even though not part of the conspiracy if they are related to it. The author further observes:

"Some courts have abandoned the limitations of furtherance and pendency altogether, and admit the declarations of a coconspirator under the *res gestae* exception to the hearsay rule. In application this standard seems to be little more than a test of relevancy."

We read the decisions of our Court of Appeals as adhering to the conservative requirements of a subsisting conspiracy and in furtherance of it but as not holding that the conspiracy comes to an abrupt and automatic end simultaneous with the completion of the offense.

Were the instant acts and statements in furtherance of a going conspiracy? We conclude that they were for these reasons:

1. There is ample evidence that the defendants were continuing to act in concert after the robbery and prior to their arrest. They went on a joint buying spree. They acted on behalf of one another and maintained communications. There was much scurrying effort to cover and conceal.

2. The utterances were made in close proximity in time and space.

3. The utterances were circumstantial and spontaneous rather than testimonial or narrative.

We have examined the other points which are included in the motions for

new trial and for judgments of acquittal and are of the opinion that they are also without merit. Accordingly, it is

Ordered that the motions should be, and the same are, denied.