STRINE, Chief Justice,
concurring:
I cannot join fully in the reasoning of my colleagues in the majority for one reason. The majority holds that the Superior Court did not abuse its discretion in denying a mistrial after the State’s witness, Kelmar Allen, improperly testified to being in witness protection based on the conclusion that: Allen only testified on one occasion that he was in witness protection; Allen gave no testimony before the jury that he feared Jeffrey or Otis; the case was not close; and, even if the jury speculated that Allen’s participation in witness protection was directly attributable to Jeffrey or Otis, the jury instruction cured any such prejudice. But, this is a case where the State argued that Otis and Jeffrey killed Herman Curry to eliminate him as an eyewitness to the 2008 murder of Christopher Palmer that Otis was wanted for.[1] Here, where the State’s theory at trial was one of “[rjevenge, retaliation, and elimination,” [2] the introduction of witness protection evidence created a high likelihood of prejudice which could not be cured by an instruction to the jury. But, because the evidence the State presented against Otis and Jeffrey was so overwhelming — and therefore this case was not at all close — I concur with the majority that the Superior Court did not abuse its discretion in denying a mistrial.
I.
After the State disclosed that four of its witnesses had entered witness protection, the Superior Court instructed the State not to elicit testimony from these witnesses regarding their participation in the witness protection program.[3] The State then put Kelmar Allen on the stand and questioned him about his plea agreement *1162 and benefits he was receiving from the State. The following exchange took place:
Q: I’m handing you now what’s been marked as State’s Exhibit 193. Take your time with that document, Kel-mar, and let us know if you recognize it?
A: Yes, ma’am.
Q: What is that document?
A: That’s my plea agreement.
⅜ $ ‡
Q: Now, without again looking at the document, what, if any, benefits did the State promise you in exchange for your plea?
A: Just the, just the, like, witness protection.[4]
Jeffrey and Otis immediately moved for a mistrial, arguing that Allen’s testimony “irreparably damaged both Otis and Jeffrey Phillips’ positions in this trial.”[5] The Superior Court denied the motions for mistrial, finding that Allen’s remark did not sufficiently prejudice Jeffrey or Otis because “Allen did not testify in front of the jury that his participation in witness protection was in any way a result of threats to him made by either defendant” and “a previously prepared and approved limiting instruction was immediately given to the jury.”[6]
The majority properly looks to the four factor analysis outlined in Pena v. State[7] as the governing standard to determine whether the Superior Court abused its discretion when it denied Jeffrey’s motion for a mistrial.[8] Under Pena, this Court should analyze: (1) the nature and frequency of the offending comment; (2) the likelihood of resulting prejudice; (3) the closeness of the case; and (4) the adequacy of the trial judge’s actions to mitigate any potential prejudice.[9]
But, in my view, neither the majority nor the trial judge has explained how a jury could ever unhear and unthink the reality that the State was paying for Allen’s living expenses — including housing and food — so that he would testify against Otis and Jeffrey.[10] As Justice Jackson explained in Krulewitch v. United States,[11] “[t]he naive assumption that prejudicial effects can be overcome by instructions to the jury, all practicing lawyers know to be unmitigated fiction.”[12]
Not only that, the curative instruction did not in any way give the jury a logical way to think about what it had just heard. The trial judge told the jury:
Ladies and gentlemen, the witness has testified that he currently has some involvement in the Witness Protection Program. There’s no evidence before you that the defendants personally made any threats, directly or indirectly, against the witness. The fact that a witness received a benefit in the program may only be considered by you for the purpose of judging the credibility of the witness, it should not be considered by you in determining the guilt of the defendants.[13]
*1163 But, in all fairness, this is too insubstantial a basis to cause a reasonable juror to be able to put away what she had just heard. A reasonable juror dealing- with a case where the State’s theory was that the Sure Shots were a dangerous gang willing to kill and intimidate those who witnessed their crimes — and that Otis and Jeffrey set out to kill Curry for just that reason[14]— would likely presume that the reason Allen was in witness protection was because of a fear that he would be the next witness targeted by the Sure Shots. That presumption would be reasonable — it was in fact why Allen was in witness protection, as the State admitted at oral argument[15] — and the State and trial judge gave the jury no reason to think there was any other basis for Allen to be in witness protection.
Furthermore, telling the jury to consider the fact that Allen was in witness protection only for the purpose of judging his credibility has no real utility because that fact was too important in the context of this case for the jury to disregard it on mere instructions. I fear this instruction asks more of jurors than we can honestly do as judges.
And, telling the jury to consider the fact that Allen was being protected by the State only for credibility purposes does not help cure any prejudice because a reasonable juror could actually give Allen’s testimony more credence on the ground that he was some sort of hero for being willing to risk his life and limbs by testifying against Jeffrey and Otis.
At best, any affirmance of the Superior Court’s decision to deny a mistrial can rest solely on the fact that this was not a close case — a Pena factor that basically creates a harmless error safety valve. There were numerous witnesses to the Eden Park shooting, and the events leading up to it, who testified at trial and implicated Jeffrey. Allen — a Sure Shots member — testified that Jeffrey and several other Sure Shots members were at a nightclub the night before the Eden Park shooting. Jeffrey was involved in an altercation with a rival gang, and Kirt Williams, a member of the Sure Shots, was shot and killed. The next morning, Allen saw Jeffrey at a house on Lamotte Street with other Sure Shots members where they were collecting guns and loading them with bullets. Seon Phillips — the leader of the Sure Shots — loaded a .40 caliber gun and gave it to Jeffrey. According to Allen, the Sure Shots were angry and they wanted to find the rival gang members from the night before.
In addition to Sure Shots witnesses, there were numerous witnesses not affiliated with the Sure Shots who were present at Eden Park and saw Jeffrey and Otis arrive together and shoot Curry and Ka-mara. Ricardo Brown, who was at Eden Park for the soccer tournament, saw Jeffrey and Otis arrive and testified that he “heard fire rockets go off. And when [he] turned around, [he] saw the two guys ... shooting their gun. One of them was shooting at Curry ... [the other] was just shooting wild, just firing wild.”[16] Venus Cherry, who was also at Eden Park for the soccer tournament, saw Otis and Jeffrey enter the park together, and he identified Otis as Curry’s shooter and Jeffrey as Kamara’s shooter. Clayon Green, another *1164 tournament participant, was in the parking lot when the shooting occurred. He testified that Otis and Jeffrey came out of a gold car and he saw them walk across the field. He then saw Otis shoot at Curry and Jeffrey “shooting wildly over in the field.”[17] Green stated that he was “a hundred percent sure” that he saw Otis and Jeffrey.[18] After the shooting, Green saw Otis and Jeffrey run towards the gold car, and he saw Jeffrey get into the back seat.
Minutes later, the police discovered the gold car crashed at an intersection. Inside the car, police discovered a 9 mm handgun, a .40 caliber handgun, and a baseball cap containing DNA from Otis. Police officers searched the surrounding area and found Otis and Jeffrey together in a back yard. They discovered 20 rounds of 9 mm ammunition in Jeffrey’s pants pocket and Jeffrey told them that he had a gunshot wound in his leg. The firearm examiner determined that the shell casings recovered from Eden Park were fired from the weapons found in the gold car.
Based on this overwhelming evidence, there was no rational dispute in the record that Jeffrey and Otis arrived together, Otis shot Curry and Jeffrey shot Kamara, and they fled together. Thus, this was not a close case for purposes of the Pena analysis.[19]
Furthermore, the jury verdict demonstrates how carefully the jury considered the evidence when it convicted Jeffrey, which provides even more support for upholding the Superior Court’s decision. The jury convicted Jeffrey of Murder in the First Degree (for. Curry), Manslaughter (as a lesser-included offense of Murder in the First Degree for Kamara), Gang Participation, Conspiracy in the First Degree, four counts of Possession of a Firearm During the Commission of a Felony, Assault in the Second Degree, Reckless Endangering in the First Degree, and Disorderly Conduct (as a lesser-included offense of Riot). The jury acquitted Jeffrey of Assault in the Third Degree and Conspiracy in the Second Degree.
This verdict demonstrates that the jury was able to distinguish between the evidence presented for the various charges and properly apply the law. For example, Jeffrey was charged with Murder in the First Degree for the killing of Kamara. At trial, Jeffrey’s counsel argued that Jeffrey “wasn’t aiming at anyone. He wasn’t targeting anyone. We have the best example of intent. This is an example of criminally negligent or reckless behavior.”[20] Indeed, the witnesses who testified at trial stated that Jeffrey was shooting “wildly.”[21] Instead of convicting Jeffrey of Murder in the First Degree or Murder in the Second Degree, the jury convicted Jeffrey of Manslaughter for the killing of Kamara. The jury instructions accurately stated that, in order to find Jeffrey guilty of Manslaughter, the jury must find that he acted recklessly, which means he “was aware of and consciously disregarded a substantial and unjustifiable risk that death would result from his conduct.”[22] This is precisely what Jeffrey’s counsel argued Jeffrey was guilty of. The fact that the jury found Jeffrey *1165 guilty of Manslaughter demonstrates how carefully the jurors considered the evidence and applied the law when reaching their decision, and supports the conclusion that even if there was an error, it was harmless.
Accordingly, I concur with the majority that the Superior Court did not abuse its discretion in denying a mistrial after Allen’s remark, but I base my finding solely on the fact that this was not a close case.
II.
For the future, it is also worth noting that this case presents some learning lessons. There was no reason for the State to ask the question it did about the benefits Allen was receiving, which he could answer truthfully only by admitting that he was receiving benefits as a participant in the witness protection program. Precisely because this was a subject that was discussed by the trial judge, the prosecution, and the defense,[23] best practice would have been for the parties to agree that the trial judge would tell the jury before Allen went on the stand that he had received a plea agreement from the State which contained certain benefits that the jury could and should take into consideration when determining the credibility of his testimony. Had that happened, this entire issue likely could have been avoided. Alternatively, the prosecution and defense could have agreed on the prosecutor’s approach. But instead, the State asked an extremely sloppy and open-ended question on an issue that all parties knew in advance had to be handled with care. In fact, by asking Allen what benefits he was receiving “without again looking at” his plea agreement, the State focused Allen’s mind on benefits outside the plea agreement, inviting the candid response Allen gave, which was that he was also receiving benefits as a participant in the witness protection program.[24]
Likewise, it is hard to look back on this case and understand how defense counsel for Otis and Jeffrey did not recognize that they were likely to come to a junction in the trial where they would be pointing fingers at each other’s clients. After Allen’s remark about being in witness protection, Jeffrey and Otis moved for severance in addition to a mistrial because they disagreed about how to deal with the harm created by the State eliciting testimony that Allen was in witness protection. Jeffrey wanted to cross-examine Allen about the financial benefits that he was receiving from being in witness protection to discredit him. Otis, however, did not want the fact that Allen was in witness protection— which underscored the State’s theory that the Sure Shots are a danger to witnesses like the deceased Curry — to be discussed any further.
But, what Otis and Jeffrey did not argue to the Superior Court was something far more troubling that would emerge only later in the case. Neither before trial, when Jeffrey initially sought severance, nor after Allen stated that he was in witness protection, did defense counsel argue that a mistrial or severance was required because Jeffrey and Otis would be pointing fingers at each other: Jeffrey, by suggesting Otis went to Eden Park to kill Curry and Jeffrey was just there by happenstance and got caught up in a melee during which he accidentally shot Kamara; Otis, by implying that he was not even present at Eden Park and suggesting Jeffrey killed both Curry and Kamara.
*1166 But, at closing arguments, that is exactly what happened. Jeffrey argued that he was not a member of the Sure Shots and he went to Eden Park innocently that day without any knowledge that Otis was going to kill Curry. Jeffrey’s counsel joined the prosecution in telling the jury that Otis should be convicted of intentional murder when he stated:
We know that the state of mind of Otis Phillip was intentional conduct. That is the best example of intent; walking up to someone, tapping them on the shoulder, firing two shots, and to believe some of the witnesses, Curry falls to the ground, he shoots him one more time for good matters, or Curry starts running and he shoots him another time, and he continues to shoot at him. That’s- intent....[25]
Jeffrey’s counsel claimed that Jeffrey was merely “criminally negligent or reckless” for wildly firing his weapon.[26]
For his part, counsel for Otis flat out argued that there was a reasonable doubt that Otis was even at Eden Park when Curry and Kamara were killed, and instead he suggested that Jeffrey was present at Eden Park and was responsible for both shootings.[27] Otis’s counsel stated that the night before the Eden Park shooting, several Sure Shots were at a nightclub where there was a gunfight, and “[i]n-volved in the gunfight, the evidence would show, is Jeffrey Phillips. Again, Otis Phillips isn’t around.”[28] The morning of the Eden Park shootings, Otis’s Counsel stated that “[t]wo people — two people — leave Lamotte Street, according to Kelmar Allen: Jeffrey Phillips and Sheldon Ogle ... We do know Otis wasn’t there.” [29]
These are not compatible theories, and it strikes me as likely that counsel for Otis and Jeffrey knew before trial — or at least by the time Allen said he was in witness protection — that these theories could form the primary basis for them ultimate defense. Furthermore, counsel should have known that the fact that their clients share the same last name but are not related was likely to create additional confusion for the jury, especially where, as here, there are several other Sure Shots with the last name Phillips who are related to Otis but not Jeffrey. But, counsel did not raise this argument either time when they moved for severance during trial.
By failing to confer with each other outside of the presence of the State, and failing to present a timely severance or mistrial motion that focused on the possibility that Otis and Jeffrey would point fingers at each other, the defenses for Otis and Jeffrey left the trial judge to focus on weaker arguments for severance that the majority properly says the trial judge was within his discretion to consider not compelling enough to accept as justifying the costs and burden of separate trials. In fairness to the trial judge, he could not have known Jeffrey and Otis would ultimately implicate each other, and trial judges cannot be expected to focus on arguments that counsel do not present. But, although there was overwhelming evidence against Jeffrey and Otis, the resulting record is nonetheless concerning and could have justified reversal and the costs of two retrials in a closer case. Without underestimating the complexities both the State and defense counsel face in handling cases where members of gangs are alleged *1167 to have committed crimes in concert, the very importance and difficulty of the potential issues arising out of a joint trial would seem to counsel for early and timely identification of and focus on those issues so they can be addressed in a thoughtful, non-seat-of-the-pants manner.

. The State’s first remarks during its opening statements set out this theory:
Revenge, retaliation, elimination. Revenge for the murder of their friend Kirt Williams. Retaliation for the attack on the Sure Shots. And elimination of Herman Curry as an eyewitness to a 2008 murder Otis Phillips was wanted for. January 2007-January 27th, 2008 started out as a birthday party for Herman Curry and ended in mayhem and murder, as Herman Curry watched Otis Phillips gun down his friend Christopher Palmer right before his eyes. It was Herman Curry who called 911 that night at that party. It was Herman Curry who told the police what happened to his friend Chris Palmer. It was Herman Curry who identified Otis Phillips as being responsible for that murder. Based on Herman Curry's statements, Otis Phillips was wanted for murder from that point on. ... [Fjueled by revenge, retaliation and elimination, armed with guns and extra ammunition, Otis Phillips and Jeffrey Phillips walked into Eden Park, walked by dozens of people, walked right up to Herman Curry, tapped him on the shoulder, and as Herman Curry turned around, they executed him ....
Trial Tr., 21-22, Oct. 20, 2014.

. Id.

. App. to State's Answering Br. at B72 (Excerpt of Witness Protection Sidebar, Oct. 21, 2014).

. Id, at B91 (Excerpt of Trial Test., Kelmar Allen, Oct. 24, 2014) (emphasis added).

. Id. at A140.

. State v. Phillips, 2015 WL 5332388, at ⅞6 (Del. Super. Ct. Sept. 3, 2015).

. 856 A.2d 548 (Del. 2004).

. Id. at 550.

. Id.

. App, to Appellant’s Opening Br. at A80 (July 2, 2014 Witness Protection Services Agreement).

. 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 (1949).

. Id. at 453, 69 S.Ct. 716 (Jackson, J., concurring) (citation omitted).

. App, to Appellant's Opening Br. at A138 (Oct. 24, 2014, Excerpt of Test. And Voir Dire Of Kelmar Allen).

. See supra note 1.

. Oral Arg. at 36:00, Phillips v. State, No. 511, 2015 (Del. Nov. 2, 2016). Allen also admitted during voir dire that he had been threatened by a Sure Shots member and that he was in witness protection due to his fear of being killed over his participation in this case. App, to Appellant's Opening Br. at A139 (Oct. 24, 2014 Excerpt of Test. And Voir Dire Of Kelmar Allen).

.App. to State's Answering Br. at B133 (Excerpt of Trial test., Ricardo Brown, Oct. 27, 2014).

. Id. at B136 (Excerpt of Trial test., Clayon Green, Nov. 5, 2014).

. Trial Tr„ 25-26, Nov. 5, 2014.

. See e.g., Payne v. State, 2015 WL 1469061, at *4 (Del. Mar. 30, 2015) (finding a case was not close under Pena when three witnesses identified the defendant as the person who committed the crime and “the State put forth substantial circumstantial evidence suggesting Payne was guilty”).

. Trial. Tr., 35, Nov. 19, 2014.

. App. to State's Answering Br. at B136 (Excerpt of Trial test., Clayon Green, Nov. 5, 2014).

. Jury Instrs., 21, Nov. 18, 2014.

. App. to State's Answering Br. at B70-72 (Excerpt of Witness Protection Sidebar, Oct. 21, 2014); id. at B76a-76b (Excerpt of Trial Conference, Oct. 22, 2014).

. App. to State’s Answering Br. at B91 (Excerpt of Trial Test,, Kelmar Allen, Oct. 24, 2014) (emphasis added).

. Trial Tr„ 33-34, Nov. 19, 2014.

. Id.

. App. to Appellant's Opening Br. at A161-64 (Nov. 18, 2014 Excerpt of Closing Arg. of Otis Phillips).

. Id. atA161.

. Id. at A164.