**UNITED STATES of America,**
**Plaintiff,**

v.

**William A. DeLOACHE, Howard M. Golden and Jack L. Marvin, Defendants.**

**Cr. A. No. 21748.**

United States District Court
W. D. Missouri, W. D.

Jan. 16, 1968.

F. Russell Millin, U. S. Atty., by Clifford M. Spottsville, Asst. U. S. Atty., Kansas City, Mo., for plaintiff.

A. J. Falcone, Kansas City, Mo., for defendant DeLoache.

Louis Wagner, Kansas City, Mo., for defendant Marvin.

Alan B. Slayton, Independence, Mo., for defendant Golden.

---

## MEMORANDUM OPINION, FINDINGS OF FACT, CONCLUSIONS OF LAW ON COUNT I

BECKER, Chief Judge.

In Count I of an information, containing eleven counts, the three defendants were jointly charged with having ("commencing prior to October 15, 1962 and continuing to on or about December 4, 1962") unlawfully, willfully and knowingly conspired in 1962 in violation of Section 371 of Title 18, U.S.C. to commit offenses and to cause to be committed offenses against the Federal Food, Drug and Cosmetic Act by dispensing, and causing the dispensing of, "amphetamine-containing drugs" without prescription contrary to the provisions of Section 353 (b) (1) of Title 21, U.S.C., while said drugs were being held for sale after shipment in interstate commerce, thereby causing the drugs to be misbranded in violation of Section 331(k) of Title 21, U.S.C.

In Count I seventeen specific overt acts were alleged to have been committed by the defendant DeLoache in pursuance of the alleged conspiracy. Some overt acts are alleged to have occurred on each of the following dates in 1962: October 15, October 16, October 26, November 14 and November 15. In Count I no specific overt acts were alleged to have been committed by either of the other two defendants Golden and Marvin. No overt acts occurring after November 15, 1962, are alleged.

Counts II to VIII inclusive charged substantive offenses, by all three defendants jointly, in causing amphetamine drugs held for sale after shipment in interstate commerce, to be dispensed without a prescription in violation of the provisions of the Federal Food, Drug, and Cosmetic Act mentioned above in the overt acts. These Counts, II to VIII inclusive, involved the alleged overt acts of October 15, October 16, October 26, November 14 and November 15 all in the year 1962.

In Counts IX, X and XI the defendant Golden alone was charged with three separate substantive violations of the Federal Food, Drug, and Cosmetic Act by causing to be dispensed specific amphetamine drugs, held for sale after shipment in interstate commerce, without a prescription in violation of the same provisions of the Federal Food, Drug, and Cosmetic Act mentioned in the conspiracy count. The dates of the alleged offenses alleged in these counts to have been committed by Golden alone are as follows:

Count IX, December 4, 1962

Count X, December 20, 1962

Count XI, December 20, 1962

Each of the defendants pleaded not guilty to each count in which he was charged. Each of the defendants DeLoache and Golden contend that he was unlawfully entrapped into the commission of any alleged offense found to be proved.

After hearing, and *in camera* inspection of statements of the accused in possession of the United States, the motion of the defendant Marvin for a bill of particulars was granted; the Motion of Defendant Marvin for Severance or for Election was denied; and the Motion of Defendant Marvin for Production of all Evidence Favorable to the Accused was denied without prejudice to its renewal of all or any part thereof at a later appropriate time.

On the initiative of the Court, for the purpose of relieving the defendants in a jury trial, of any prejudice resulting from joinder of the counts of the information, a first and separate trial upon Count I was ordered pursuant to the authority granted by Rule 42, F.R.Crim.P.

The foregoing rulings were incorporated in memorandum and orders filed December 6, 1965, the text of which is as follows:

"This is a prosecution by information in nine Counts for illegal dispensation of amphetamine compound drugs. Count I is a conspiracy Count. The remaining 8 Counts charge substantive offenses.

"At a hearing on October 4, 1965, in the presence of each defendant and counsel, the following motions were heard:

"1. Defendant Marvin's Motion for Production of All Evidence Favorable to the Accused.

"2. Motion of defendant Marvin for Severance or for Order of Election.

"3. Defendant Marvin's Motion for Bill of Particulars.

"At the hearing it was announced that the defendant Marvin's Motion for Bill of Particulars would be sustained. Since that time the United States has filed the bill of particulars requested by the motion.

"On the question of the proof of the nature and interstate shipment of the drugs alleged to have been dispensed the government agreed to furnish informally to the defendants the chemical analysis and place of origin of the drugs, with a view toward securing a stipulation concerning the nature and interstate shipment thereof. The United States reports that this has been done.

"Following this it was determined that the Motion for Production of All Evidence Favorable to the Accused should be denied without prejudice to renewal at an appropriate later time according to law, of any request therein.

"There now remains for consideration defendant Marvin's Motion for Separate Trial or for Election. In this connection the United States has furnished for *in camera* inspection statements of the defendants in its possession.

"After seeing the statements and after considering the arguments made by counsel on October 4, 1965, it has been concluded that the motion of defendant Marvin for severance or for election should be denied.

"Any prejudice which might otherwise result to Marvin from joint trial can be prevented by proper instructions of the Court if the extrajudicial statements are admitted in evidence or used for impeachment. Opper v. United States, 348 U.S. 84, 75 S.Ct. 158, 99 L.Ed. 101; Krulewitch v. United States, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790.

"However, in view of the facts (A) that in the Conspiracy Count I defendant Marvin is not charged with the commission of any of the overt acts alleged therein, but is charged with the commission of the substantive offenses paralleling the overt acts alleged in Count I, paragraphs (d) (Count II), (e) (Count III or IV), (f) (Count V?) and (i) (Count VI), and (B) defendant Marvin is not charged with the commission of substantive offenses paralleling other overt acts alleged in Count I, paragraphs (m) (Count VII), and (q) (Count VIII), and (C) in the substantive Counts IX, X and XI defendant Marvin is not charged with commission of the offenses, it is determined that a separate trial of Count I should be held before the trial of the substantive Counts to relieve the defendant Marvin and other defendants from any prejudice resulting from joinder of Counts.

"This ruling renders moot the motion to elect upon which Count or Counts to proceed.

"For the foregoing reasons it is hereby

"ORDERED that defendant Marvin's Motion for Bill of Particulars be, and it is hereby, granted. It is further

"ORDERED that the Motion of Defendant Marvin for Severance or for Election be, and it is hereby, denied. It is further

"ORDERED that defendant Marvin's Motion for Production of all Evidence Favorable to the Accused be, and it is hereby, denied without prejudice to renewal of all or any part thereof at a later appropriate time. It is further

"ORDERED that pursuant to Rule 14, F.R.Crim.P. a separate and first trial be held on Count I of the information. It is further

"ORDERED that within 15 days counsel for the United States secure, if possible, a stipulation signed by defendants on the facts concerning the nature and interstate shipment of the drugs in question or report the failure to stipulate. In this connection defendants are advised that no stipulation need be entered into by them or any of them, and that the stipulation, if made, may be used in evidence against any party thereto."

Thereafter the parties executed and filed waivers of jury trial, and stipulations of fact.

The cause came on for hearing before the Court without a jury on Count I (the conspiracy count) alone. The order for a separate trial on Count I was not vacated. After the conclusion of the evidentiary hearing, oral arguments were heard, written briefs and requests for findings of fact were submitted and the cause was taken under advisement.

Partly because of the potential effect of pending cases in the Courts of Appeal, and in the Supreme Court of the United States upon the development of the law applicable to this case, including the law relating to entrapment, criminal conspiracy, admissibility of evidence and discovery in criminal cases, final decision in this cause was stayed. There appears to be no purpose to be served in delaying this decision further.

### Stipulation of Facts

By written stipulations signed by the defendants DeLoache and Golden personally and by their counsel, the following facts were stipulated:

"1. That the drugs involved in each count of the Information were shipped in interstate commerce, as alleged.

\*   \*   \*   \*   \*   \*

"4. That the drug involved in Counts II, III, VI, and VII of the Information is d-amphetamine hydrochloride.

"5. That the tablets involved in Counts II, III, VI, and VII of the Information were manufactured outside the State of Missouri.

"6. That the drug involved in Counts IV and XI of the Information is dl-amphetamine hydrochloride.

"7. That the tablets involved in Counts IV and XI of the Information were manufactured outside the State of Missouri.

"8. That the drug involved in Count V of the Information is amphetamine sulfate.

"9. That the tablets involved in Count V of the Information were manufactured outside the State of Missouri.

"10. That the drug involved in Counts VIII, IX, and X of the Information is dl-amphetamine sulfate.

"11. That the tablets involved in Counts VIII, IX, and X of the Information were manufactured outside the State of Missouri."

The relationship of the stipulated facts to the alleged overt acts in Count I is not controverted and is readily discernible from an examination of the information, the bill of particulars, the stipulations and the transcript of the record herein. The relationship is as follows:

Count II alleges overt acts (a), (b), (c) and (d) of Count I.

Counts III and IV allege overt act (e) of Count I.

Count V alleges overt act (f) of Count I.

Count VI alleges overt acts (g), (h) and (i) of Count I.

Count VII alleges overt acts (j), (k), (*l*) and (m) of Count I.

Count VIII alleges overt acts (n), (o), (p) and (q) of Count I.

By these stipulations the defendants and their counsel displayed commendable candor which greatly narrowed the issues for trial.

### The Burden of Proof

In making the findings of fact herein the rule has been applied that the government bears the burden of proving beyond a reasonable doubt all (unstipulated) essential facts of the alleged offense in respect to defendants, and each of them. Further this rule has been applied to require the government to prove the absence of unlawful entrapment in respect to the defendants and each of them who has asserted the defense.

### Findings of Fact

On the basis of the stipulations and the evidence, the following facts are found:

In October, November, and December 1962 all defendants resided in Jackson County, Missouri.

The defendant Marvin was a licensed chiropractor (D.C.) residing at 1206 West 63rd Street, Kansas City, Missouri, with offices at 811 Linwood, in the same city. From early October 1962 until February 1963, and during the time of the alleged conspiracy, an osteopathic intern Dr. Munshaw shared these offices on a part time basis with defendant Marvin using Marvin's private office for service to patients referred to him by defendant Marvin or his assistants. This arrangement permitted patients of defendant Marvin to secure services which could lawfully be furnished by Dr. Munshaw, an osteopathic physician, but not by Marvin as a chiropractor. These services of Dr. Munshaw included the dispensing and prescribing of amphetamine and other prescription drugs. During their association including the time of the alleged conspiracy Dr. Munshaw paid defendant Marvin one half of the fees earned by him at the office for "office rent."

There was no prescription for dispensation, purchase or sale of the amphetamine drugs mentioned in this memorandum. Defendant Marvin had no legal authority to dispense or prescribe amphetamine prescription drugs under the laws of Missouri or of the United States. Golden, however, was authorized to sell and deliver amphetamine drugs to Dr. Munshaw who had authority to dispense and prescribe them.

From October 1962 until February 1963, Dr. Munshaw kept a supply of drugs, including amphetamines and the other prescription drugs in a storage cabinet (labelled "Property of Dr. Munshaw") above the sink in the kitchen of the offices of defendant Marvin. The cabinet was equipped with a combination padlock which was intended to secure the drugs in the cabinet from access without Dr. Munshaw's authorization. The combination was written on the bottom of the cabinet and available to the staff of defendant Marvin. At times this cabinet was left open during business hours and amphetamine drugs were placed therein by defendant Golden and removed therefrom by defendant DeLoache, and perhaps others without the authorization of Dr. Munshaw.

When Dr. Munshaw began his tenure at the offices of defendant Marvin he put an initial supply of drugs including amphetamines in the storage cabinet assigned to him. Later Dr. Munshaw ordered a supply of amphetamine and other drugs from a drug supply house located in the eastern United States. This order was placed with an order placed by defendant Marvin for supplies Marvin was authorized to dispense and use.

Dr. Munshaw's principal use for amphetamines which he proposed was to dispense them with directions to obese pa-

tients of his for weight reduction. On occasion while absent from the offices of defendant Marvin, Dr. Munshaw by telephone directed the nurse Hill (nee Kaler) serving him and Marvin, to dispense prescription drugs to patients of Dr. Munshaw.

Soon after Dr. Munshaw began his association with defendant Marvin he was introduced to defendant Golden by defendant Marvin in the offices of Marvin.

During the time of the alleged conspiracy and for eight years prior thereto defendant Golden was the proprietor of and salesman for Foxx Pharmaceutical Company of Independence, Missouri, a supplier of drugs, including amphetamine prescription drugs, and also of vitamin products. The inventory of amphetamine drugs of his company included 200,000 to 300,000 units at the times of the hearing herein. The company served about 200 customers. One customer ordered as many as 25,000 to 50,000 amphetamine units each six weeks.

For six to eight months prior to October 1962 the defendant Golden had been acquainted with the defendant Marvin, who had during that time purchased from him nonprescription products such as vitamins. Marvin had never paid Golden by his personal check, but usually paid in cash. Once or twice he had paid by an endorsed patient's check. In October 1962 Marvin had introduced Golden to Dr. Munshaw as an osteopathic physician associated with Marvin who would handle the medical problems of the "clinic". Further Marvin said then that the Marvin offices ("our clinic") would be treating obesity and would need other drugs in the future. Previously Golden had sold no prescription drugs to Marvin. This prospect of increased business pleased Golden. Thereafter Golden personally sold Dr. Munshaw amphetamine prescription drugs, but most sales "to the office" were made on orders by telephone by Marvin or his nurse. Some of these telephone orders were received by Mrs. Golden. Within a short time the supplies ordered by telephone, including amphetamine prescription drugs, were delivered personally by Golden to offices of defendant Marvin where the payment at the usual price therefor was received in cash usually from the office nurse but sometimes from Marvin. The amounts of amphetamine drugs ordered by the nurse and Marvin during Dr. Munshaw's association with Marvin was not an unusual amount for the needs of an osteopathic physician. The invoices for drugs including prescription amphetamine drugs were usually billed by Golden to "Drs. Munshaw and Marvin". Occasionally the billing of these items were to Dr. Munshaw alone.

Prior to December Golden had met the defendant DeLoache and had sold DeLoache some amino acids and vitamins for the personal use of DeLoache.

During the time of the alleged conspiracy defendant DeLoache was a married young man attending the Cleveland Chiropractic College of Kansas City as an undergraduate from 9:00 a. m. to 2:00 p. m. daily during the week. Contemporaneously he also held part time jobs as a musician in an orchestra for four hours each of six nights a week, and as a judo instructor three afternoons a week. At the time of the alleged conspiracy DeLoache was the father of two children, and expecting a third child. Being without independent means DeLoache was in needy financial circumstances as he sought to become a chiropractor. He was in arrears in his tuition and feared dismissal before graduation because of lack of funds. (He later became a Doctor of Chiropractic in April 1963.)

Prior to October 1962 DeLoache was associated with defendant Marvin as a senior student observing and acquainting himself with procedures at the offices of Marvin and helping about the office.

Shortly before October 1962 defendant DeLoache and some other musicians were having a "jam session" on Saturday night at a coffee house, when Jimmy Johnson, a bass player who said he had just come to Kansas City and that he had been playing with a jazz singer, came in and asked if he could sit in and play. He was permitted to do so. Johnson then said that

he had no money and no place to stay. He related that he didn't belong to the local musicians union and couldn't work as a musician then. DeLoache invited Johnson to spend the night at his home. Johnson accepted. It developed later that Johnson admitted that he was an ex-prisoner who had been convicted of possessing marijuana, but DeLoache was unaware of this at the time. On October 12, 1962, a short time later, Johnson approached DeLoache on the sidewalk near the Cleveland Chiropractic College and asked DeLoache to get him some amphetamine tablets, saying that he had a chance to go back on the road as a musician and needed the tablets to keep him awake on the new job which would entail overnight travel. DeLoache after demurring, agreed to get the tablets. DeLoache then proceeded to the offices of defendant Marvin where without the knowledge of anyone else, he secured 100–140 amphetamine tablets out of a bottle in the cabinet assigned to Dr. Munshaw.

Prior to October 12, 1962, Jimmy Johnson was acquainted with an informer for the government, one John Vaughn. Prior to October 12, Vaughn had introduced Federal Food and Drug Inspector Harold Leap to Jimmy Johnson as a musician who, Vaughn said, "had a pill connection".

On October 12 Agent Leap in company with Vaughn, Johnson and two prostitutes drove to the vicinity of the Cleveland Chiropractic College where Johnson got out and made the purchase of the 100–140 amphetamine tablets from defendant DeLoache. Johnson paid DeLoache 2 or 3 dollars for them. After delivery of the tablets by DeLoache to Johnson, DeLoache drove Johnson to a point near the car in which Agent Leap, Vaughn and the women were waiting. Johnson got out of the car driven by DeLoache and got in Agent Leap's car. Out of DeLoache's presence Johnson then sold the amphetamine tablets bought from DeLoache to Agent Leap for $30. DeLoache and Leap did not meet at this time.

Suspecting that the source of the drugs sold by DeLoache on October 12 was defendant Marvin, Agent Leap and informer Vaughn went to the offices of defendant Marvin on the following day.

There Agent Leap and informer Vaughn were admitted to the inner rooms of the office of defendant Marvin. Vaughn had a bruised and swollen hand. Vaughn's bruised and swollen hand was examined by Marvin and later x-rayed. Marvin gave Vaughn's hand a heat treatment. Testing Marvin's willingness to dispense prescription drugs Vaughn asked for a pain reliever. After making a telephone call to Dr. Munshaw to secure authorization Marvin produced from another room some prescription drug tablets in a small box which he handed to his nurse Hill (nee Kaler) to put the directions on it which she did and delivered the box to Vaughn. There were no amphetamine drugs in the box, and there is no contention that the dispensation of these drugs was unlawful.

On October 15, 1962, Agent Leap and informer Vaughn went together to the Cleveland Chiropractic College where they met DeLoache as he came from class. Vaughn told DeLoache that he and Agent Leap (using the alias Dale Jensen) wished to talk with him in an automobile. In the automobile Leap and Vaughn arranged to purchase from DeLoache a quantity of amphetamine drugs. Within the hour DeLoache left and later returned with a bottle of 1,000 capsules containing an amphetamine drug ("browns") and with a partially filled bottle containing 170 white amphetamine tablets ("whites") all of which Agent Leap purchased for $10. Agent Leap was reluctant to buy amphetamine capsules because of difficulty in proving the interstate shipment thereof. The sale of the capsules is omitted from the charges of the information because there was no proof of interstate shipment thereof. (On October 15 DeLoache got the capsules and tablets sold to Agent Leap from the cabinet assigned to Dr. Munshaw by opening the locked cabinet. No one else as-

sisted. The combination to the lock was secured from the writing on the cabinet.)

DeLoache then proposed to get more white amphetamine tablets the next day, October 16, for sale to Agent Leap. DeLoache then returned to Marvin's offices where he worked.

On October 16 pursuant to prior arrangement, defendant DeLoache sold and delivered to Agent Leap 2,000 white amphetamine tablets for $140. (DeLoache had secured these tablets from Dr. Munshaw's cabinet where they had been delivered pursuant to a telephone order placed by nurse Hill (nee Kaler) from an order list of needed medication to which 2,000 tablets had been added surreptitiously by DeLoache alone. The order was filled by Golden's Foxx Pharmaceutical Company.) After delivering the 2,000 tablets DeLoache then asked Agent Leap if he would be interested in purchasing about 250,000 white amphetamine tablets at 5¢ each plus a "cut" to DeLoache. When Agent Leap objected to the price DeLoache said he would talk to the "doctor" about absorbing DeLoache's "cut" and call back to let Agent Leap know what the "doctor" said. DeLoache implied that an unnamed "doctor" was his source of supply of amphetamine tablets. DeLoache then returned to Marvin's offices where he worked.

On October 25, 1962, Agent Leap and informer Vaughn met DeLoache coming out of the Chiropractic College at about 2:00 p. m. Agent Leap asked DeLoache to deliver to him 10,000 white amphetamine tablets. One half hour later DeLoache returned to a bar where Agent Leap waited and delivered to Agent Leap about 500 pink amphetamine tablets for a cash payment of $20. DeLoache had secured these tablets from Dr. Munshaw's cabinet at Marvin's offices. DeLoache then agreed to get ten thousand white amphetamine tablets at 4 cents each for Agent Leap the following day, October 26, 1962. DeLoache then returned to Marvin's offices where he worked.

On November 13 Agent Leap again met DeLoache as he came out of College at about 2:00 p. m. and ordered from De-Loache 10,000 white amphetamine tablets. Within about 20 minutes DeLoache returned reporting that "the doctor didn't have any" but that he was expecting a shipment the next day. Agent Leap made an appointment to see DeLoache the next day, November 14.

On November 14 DeLoache met Agent Leap as DeLoache came out of the College at about 2:00 p. m. DeLoache left and returned in about 20 minutes to a cafe where he delivered to Agent Leap 2,000 white amphetamine tablets for $80 paid by Leap. These 2,000 tablets had been ordered from Golden's Foxx Pharmaceutical Company by DeLoache on Dr. Munshaw's account and delivered to Marvin's offices. Arrangements were made by Agent Leap for delivery of a larger order by DeLoache the following day. DeLoache then returned to Marvin's offices where he worked.

On the following day, November 15, 1962, defendant DeLoache met Agent Leap pursuant to plan and sold Leap 10,000 amphetamine tablets for which Leap paid $400. Agent Leap then expressed again a desire next time to buy a larger quantity, probably 100,000 tablets.

On November 30 Agent Leap with two other government agents met DeLoache as he came out of College and revealed their identity. Thereupon they questioned DeLoache about the source and procedure in securing the amphetamine tablets sold to Leap. DeLoache told the agents that defendant Marvin was not involved; that DeLoache would go to the clinic and get the drugs leaving money on the shelf; that DeLoache didn't know where the money went after that. These latter statements are not admitted in evidence against or for any defendants for many reasons including their inadmissibility under the doctrine of Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977, and their inadmissibility against the alleged co-conspirator after termination of the alleged conspiracy. Paoli v. United States, 352 U.S. 232, 77 S.Ct. 294, 1 L.Ed.2d 278; Annotation 1 L.Ed.2d 1780 l. c. 1786 to 1788, Sec. 4.

At the request of Agent Leap, and while in fear of the consequences of refusal on his career and family relationship, DeLoache accompanied Agent Leap to defendant Marvin's offices. In the presence of Agent Leap, whose identity was unknown to Marvin, DeLoache asked Marvin to sell some amphetamines to Leap. Marvin refused stating that DeLoache and Leap would have to wait until Dr. Munshaw came to the office later in the day.

At no time did Dr. Munshaw know that DeLoache was ordering drugs on the ac· count of Dr. Munshaw and selling them.

All drugs sold by DeLoache to Johnson and Agent Leap were amphetamine drugs, which had previously moved in interstate commerce and which were unsafe as defined in Sec. 353(b) (1) (B) of Title 21, U.S.C.

Over the objections of the defendants evidence was received which tended to prove the following additional facts admitted conditionally and now deemed to be inadmissible on Count I to prove a conspiracy: (Because none of these alleged facts were included as overt facts in the information or in the proposed findings of fact submitted after the hearing by the government among other reasons for inadmissibility of evidence.)

On December 3 Agent Leap and Inspector Russell of the Food, Drug and Cosmetic Administration met DeLoache as he came from the College. DeLoache knew the identity of Leap and Russell. At the request of Leap and Russell, DeLoache attempted to call Golden by telephone in an effort to get Golden to sell amphetamine drugs to Agent Leap but was unable to reach him. DeLoache agreed to continue his efforts to communicate with Golden about selling drugs to Agent Leap. At this time DeLoache was cooperating with the government in hopes of escaping punishment.

On December 4, DeLoache advised Agent Leap that pursuant to Leap's suggestion, he had talked to Golden about selling amphetamine drugs and that Golden wanted to meet the customer. De-

Loache reported that he had arranged a meeting with Golden at Sidneys Restaurant at noon. Pursuant to this arrangement DeLoache and Agent Leap (whose identity was unknown to Golden and who was using the alias Dale Jensen) met at the restaurant.

There Agent Leap proposed to deal directly with Golden in the purchase of amphetamines. Golden then assumed (without any information except a telephone call from Marvin about the meeting at Sidney's restaurant) that Marvin was a party to the proposal to sell amphetamines to Agent Leap. Agent Leap at this meeting said that if a sale to him was made DeLoache would receive $400 to pay on his tuition. Golden then agreed to sell amphetamines to Agent Leap. Golden agreed at first that these drugs be delivered to the Marvin offices so that Marvin could "have his cut on the last buy". DeLoache (who has consistently denied Marvin's complicity) then said "I didn't know that about Jack" Marvin. Agent Leap kicked DeLoache's shins to quiet him. The plan of Agent Leap was by routing the drugs through Marvin to secure direct evidence of Marvin's participation in an illegal sale, which had not been obtained on two previous attempts. According to the plan Golden would deliver amphetamines to Marvin who would permit DeLoache to sell them to Agent Leap for a portion of the proceeds. This plan failed.

DeLoache met Agent Leap at the parking lot where according to plan delivery of the drugs was to be made. DeLoache was requested to go pick up the drugs "as he normally did". DeLoache returned and reported that Golden had changed the plans and asked that DeLoache and Leap come to Golden's home to pick up the drugs. As requested DeLoache and Agent Leap came to Golden's home where Golden sold Agent Leap 5,000 amphetamine tablets for $135. There is no evidence that Marvin knew of the transaction.

Thereafter on December 20, 1962, Agent Leap made another purchase of 5,000 amphetamine tablets for $375 from

Golden at a public parking lot at 24th and Hardesty Streets.

On January 11, 1963, after warning DeLoache of his rights Agent Leap obtained a written statement from De-Loache who was assured expressly or impliedly that no publicity concerning his conversation with the illegal drug traffic would occur until DeLoache completed school and his qualifying chiropractic examinations. The written statements of DeLoache quoted Golden as stating at the December 4 meeting that Marvin was a party to the illegal sales of October and November 1962. This statment was obviously hearsay as to Marvin and Golden and was not made while the alleged conspiracy was pending and in furtherance of its object. It was made after De-Loache, the declarant, had been apprehended. Under principles of law discussed hereinafter, DeLoache's statements after apprehension are not admissible against the codefendants Marvin and Golden.

*Question of Existence of Conspiracy*

The government contends that the evidence proves beyond a reasonable doubt the existence of a conspiracy between DeLoache, Golden and Marvin to sell amphetamine drugs illegally. For reasons stated hereinafter it is found that the evidence fails to establish such a conspiracy between two or more of the defendants. The reasons for this conclusion follow.

A criminal conspiracy is an understanding, express or tacit, to accomplish an unlawful object by unlawful or lawful means, or by unlawful means a lawful object. It is a partnership in crime, the gist of which is a combination of minds to violate the criminal law. 1, Wharton, Criminal Law and Procedure, § 82, § 83 and § 87, and authorities therein cited including United States v. Hirsch, 100 U.S. 33, 10 Otto 33, 25 L.Ed. 539; Marino v. United States (C.A.9) 91 F.2d 691, 113 A.L.R. 975; Duke v. United States (C.A.5) 233 F.2d 897. A criminal conspiracy is an offense distinct from the crime contemplated (the sub-stantive offense). It is the unlawful agreement which constitutes the gist of the offense, not the criminal act or acts done in pursuance thereof. 1 Wharton, Criminal Law and Procedure, § 87; United States v. Rabinowich, 238 U.S. 78, 35 S.Ct. 682, 59 L.Ed. 1211.

A criminal conspiracy may exist without any formal written agreement, oral agreement or speaking of words of agreement. 1 Wharton, Criminal Law and Procedure, § 83. American Tobacco Co. v. United States, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575. The existence of a conspiracy can be proved by the conduct of the parties. 1 Wharton, Criminal Law and Procedure, § 84; Interstate Circuit, Inc. v. United States, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610; United States v. Masonite Corp., 316 U.S. 265, 62 S.Ct. 1070, 86 L.Ed. 1461, reh. den. 316 U.S. 713, 62 S.Ct. 1302, 86 L. Ed. 1778.

Nevertheless a conspiracy cannot be deemed to be proved unless there is proof of an agreement to commit an offense against the United States. Ingram v. United States, 360 U.S. 672, 79 S.Ct. 1314, 3 L.Ed.2d 1503, reh. den. 361 U.S. 856, 80 S.Ct. 42, 4 L.Ed.2d 96.

Assuming however (without so holding) that a submissible case has been made on Count I against two or all the defendants, the proof falls far short of meeting the burden of proof beyond a reasonable doubt that a conspiracy existed.

The proof is clear that before De-Loache discovered the identity of Agent Leap, DeLoache committed substantive violations of the criminal law unless his plea of entrapment is valid. There is no persuasive evidence that prior to the apprehension of DeLoache by the government agents on November 30, either Golden or Marvin were parties to any agreement, express or implied, concerning De-Loache's traffic in amphetamine drugs.

The proof of the existence prior to December 4 of a conspiratorial agreement between Marvin on one hand and De-Loache and Golden, or one of them, on

the other hand, is not substantial. Marvin neither committed nor is charged with an overt act. Marvin thrice refused to dispense drugs illegally. No proceeds of any of the sales are traced to him by substantial evidence. DeLoache denies that Marvin had knowledge of DeLoache's activities.

There are some suspicious circumstances for example, the use made of Marvin's offices by DeLoache, and DeLoache's statement that he put sums of money in Dr. Munshaw's cabinet. Further one may surmise that Marvin ought to have known of DeLoache's activities in securing drugs on Dr. Munshaw's account and from Dr. Munshaw's cabinet, but such a surmise adds no substantial proof of Marvin's guilt of criminal conspiracy. Golden's testimony that Marvin called him to request a meeting at Sidneys Restaurant in December, if believed, is not a compelling circumstance. There is no evidence that this request, if made, was made with knowledge of the purposes of the meeting.

DeLoache's reference to the "doctor" while negotiating with Agent Leap, before DeLoache disclosed Leap's identity, cannot be relied on to convict Marvin because the "doctor" referred to is not identified as Marvin, and because absent proof of the existence of a conspiracy to which Marvin was a party, DeLoache's statements are not admissible against Marvin.

These and other suspicious circumstances do not meet the standard of proof of facts applicable to criminal cases. The government's suspicions of Marvin may be justified but suspicions are not proof. On three occasions when Marvin was directly solicited to dispense prescription drugs he refused. Leap and DeLoache were unable to induce him to participate in the December 4 transaction.

There remains the question whether a conspiracy existed between DeLoache and Golden. Golden denies that prior to December 4 when DeLoache was a cooperating informer he even had knowledge that amphetamine drugs sold by him to Munshaw were being illegally resold by DeLoache. Here again there are suspicious circumstances suggesting that Golden had agreed with DeLoache in October or November or both to supply amphetamine drugs for illegal resale.

The evidence is stronger on the existence of a conspiracy between DeLoache and Golden before DeLoache became an informer to save his student and professional status. DeLoache testified, at one point (Tr. 396–405) that when ordering drugs on Dr. Munshaw's account he advised Golden he was reselling the drugs to a friend; that he left two thirds of the proceeds in Dr. Munshaw's cabinet; that he assumed without knowing that Golden got the money from the cabinet. This latter testimony was in part contrary to his written statement. It may be that prior to November 30, the time of his apprehension, Golden and DeLoache had an agreement to deal illegally in amphetamine drugs. This, however, is not proved sufficiently to constitute proof beyond a reasonable doubt.

The conspiracy count in this case appears to have been filed against three defendants when the prosecution had sufficient proof (subject to unlawful entrapment defenses) against only two defendants of substantive offenses only. Thereby it was hoped to convict all three of conspiracy under the relaxed rules of evidence in conspiracy cases. This practice has been condemned for many years because of its obviously prejudicial features. See concurring opinion of Mr. Justice Jackson in Krulewitch v. United States, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 l. c. 795–801.

*Conclusion*

The government has failed to prove the essential elements of the charge contained in Count I in respect to any of the defendants. Therefore it is hereby found that the defendants, and each of them, are not guilty of the charges contained in Count I.

Therefore, it is hereby

Ordered and adjudged that the defendants, and each of them, are not guilty of the charges contained in Count I. It is further

Ordered that jurisdiction be retained for trial of the defendants on the substantive counts of the information.